## JAMES SUNDAY v. STATE.

No. A-2390.   Opinion Filed September 24, 1918.

(174 Pac. 1095.)

1. **EVIDENCE—Res Gestae.** On a trial for murder, where it appeared that the deceased and the defendant had an altercation during the progress of a card game, and the defendant then went to his home and procured a gun, and returned therewith, and shot the deceased, statements made by the defendant to his sisters that he was taking the gun with the intention of arresting the deceased, were admissible as part of the **res gestae.**

2. **APPEAL AND ERROR—Harmless Error—Exclusion of Evidence.** Where the testimony of the defendant was that he took his Winchester rifle and followed the deceased and his two companions, and meeting them near their home, and without speaking to them, fired three shots, killing the deceased, and where upon the undisputed facts there was not the slightest authority in the defendant to arrest the deceased, it did not constitute reversible error to exclude the testimony of the defendant's statements to his sisters.

*Appeal from District Court, Muskogee County;*
*Fred P. Branson, Judge.*

James Sunday was convicted of murder, and he appeals.   Affirmed.

The plaintiff in error was convicted of the murder of Frank Dandridge, alleged to have been committed on or about the 8th day of March, 1914, by shooting with a Winchester rifle, and he was duly sentenced in accordance with the verdict to imprisonment for life at hard labor.

The evidence shows that at the time Frank Dandridge was killed he was living at the home of his brother-in-law, Henry Phillips, about two and one-half miles north of Porum, and Pleas Taylor, a hired man, was also living at the Phillips home; that the defendant, Sunday, a Cherokee

Indian, at the time lived with his mother and sisters, about
a quarter of a mile from the Phillips home; that on Sun-
day afternon, March 8th, the defendant went to the home
of Henry Phillips, and Dandridge and Taylor were
there; that the defendant gave Taylor the money, and he
went to town and returned with one or two pints of alcohol
or whisky; that after drinking the liquor they together
went after supper to a church in the neighborhood and
attended a prayer meeting; that after the prayer meeting
it was agreed among these parties to have a game of poker;
that the defendant and Henry Phillips went to his home
and procured a lantern, and Dandridge and Taylor went
to the Phillips home after a deck of cards; that subse-
quently they all met at a vacant cabin in a field about half
a mile from the Phillips home; that during the progress
of the game the defendant accused Dandridge of stealing
cards and taking his money; that the defendant then took
his lantern and left; that the other three also left to-
gether for the Phillips home; that just before they arrived
at the Phillips home the defendant met them and shot
Frank Dandridge with a Winchester rifle.

A substantial statement of the evidence in the case is
as follows:

Henry Phillips testified: That he went to church
with Frank Dandridge, Pleas Taylor, and Jim Sunday.
That from church all four went to George Sunday's. That
from there Frank Dandridge and Taylor went by his place
to get a deck of cards, and they all met later at the little
shack. That they were playing poker, and he threw down
a $5 bill, and Sunday put down a bill, then he took his
money up, and Sunday said to Dandridge, "Give me my
bill," and Dandridge said he didn't have it, and witness
said to Dandridge, "If you have got Sunday's money give

it to him." That they looked for the bill, but could not find it, and Sunday said, "If you don't give me my money I am going for my Winchester." That Sunday then took his lantern and started towards home. That Dandridge had a pistol, and witness took it from him. That a few minutes after Sunday left witness heard a gun fire twice over about Sunday's house. That it was a bright moonlight night. That they started home and were walking along side by side with Dandridge in the middle when they met Sunday coming towards them. That Sunday fired three or four shots, and Dandridge fell. That he walked up to them and told witness to throw the six-shooter down, which he did, and Sunday held his Winchester in one hand and picked up the six-shooter with the other. That he then told witness to go ahead, and when they got to the road Sunday's sisters were there. That about that time witness' wife appeared, and he left Sunday in the road, and went home with his wife. That he did not go to the body until the officers came, which was about an hour after the shooting.

Pleas Taylor testified: That he did not play in the game. That a dispute arose over stealing cards, and Sunday said, "Frank you stole some cards," and Frank said he had not, and Sunday said, "Yes, you have; you put your hand through the crack," and he counted the deck, and only one was gone, and Sunday said, "You stole some money," and Frank said, "He did not," and Sunday said he had, and Frank said he could whip him, and Sunday said, "He could not whip anybody," and there were some more words, and Sunday said, "Well, I am going home to get my gun, and you will give it up to me," and grabbed the lantern and went out. That about the time for Sunday to get home two shots were fired about his house. That

they walked towards Phillips' house across a plowed field, and when about half way across the field Sunday appeared in front of them, and he said, "Oh, yes, God damn you," and then fired three or four shots with a Winchester, and witness ran away.

Rose Phillips testified: That she was the wife of Henry Phillips, and sister of Frank Dandridge. That she heard two shots fired that night about midnight, the sound coming from Jim Sunday's house. That she got up and went to the door and saw Jim Sunday coming up the road in the direction of her house. That he was running, and turned into a little lane near the garden, and went out into the field. That in a few minutes she heard three or four shots, and heard her brother say, "Oh!" when the bullet hit him. That Jim Sunday's house was about a quarter of a mile north of her house.

Other witnesses testified as to finding three 38 Winchester shells near where the defendant stood when he fired the shots.

Lee Miller testified: That Jim Sunday came to his house that night about midnight and called him, and he got up and went out on the porch where Sunday was stand· ing with a Winchester and a six-shooter, and Sunday said he had shot Frank Dandridge, and said, "I want to give up, and I want you to go with me to Bill Fool," and he put on his clothes and went with him. That Sunday said they had all been drinking that evening, and went to prayer meeting, and then they proposed a poker game, and Henry Phillips went with him to his house to get a lantern to play by, and Pleas and Frank went by Henry's to get a deck of cards, and all met in the vacant house. That they played a while, and he threw down a $5 bill, and Frank picked it up, and they played on a while, and he

told Frank he wanted his money, and Frank said he did not have it, and he said he knew he got it, and Frank jerked out a six-shooter and said, "I will give you that," and he said, "Well, if that is the game, I will go home and get my gun," and he picked up the lantern and went home. That Sunday then said, "I got my gun and went on down to Henry's and came up the field and met them, and when I got up 50 or 40 yards they began shooting at me, and I commenced shooting, and then I just started to kill them all, and Frank fell and Pleas ran. When Frank fell Henry picked up the gun, and I ran up to him and took the gun, and he said, 'Here it is.' "

There was testimony showing that the bullet entered just below the left nipple, and that the body was lying face down about 150 yards from Phillips' house.

For the defense Callie Sunday testified: That she was a sister of the defendant. That on the night that Frank Dandridge was shot her brother first came to the house and got a lantern, and Henry Phillips was with him. That afterwards about 1 o'clock he came back and got his Winchester. She was then asked:

"Q. What did he say he was going to do with the gun, if anything?

"Mr. Disney: Objected to as self-serving.

"Mr. Crump: The defendant excepts and insists it is a part of the *res gestae* what he said at the time.

"The Court: Objection sustained."

She further testified: That she and her sister Eva got up and followed her brother. That they were standing in the road, and other parties fired two shots before her brother fired. That her brother fired three shots, and at the third shot one of the men fell.

Eva Sunday testified: That she was a sister of the defendant. Her further testimony was the same as that of her sister's. She was then asked:

"Did Jim tell you what he wanted with that gun? A. Yes, he told her.

"Mr. Crump: Now if the court please, I want to state here is the same question I asked the other witness about, I want to make a record. We now offer to prove by this witness that the defendant when he came after his gun told this witness and her sister that Frank Dandridge had robbed him of $6; that he was going down and arrest him and take him to Will Fool, deputy sheriff, and that for that reason this witness and his sister followed Jim down to where the trouble occurred.

"Mr. Disney: I object.

"The Court: Objection sustained.

"Mr. Crump: To which I except."

As a witness in his own behalf the defendant testified: That he was a full-blood Cherokee, 30 years of age, and that Will Fool was a deputy sheriff, and that he had been assisting Will Fool as an officer. That he had known Frank Dandridge since he was a little boy. That he went to Henry Phillips' house that afternoon and gave the money to Pleas Taylor to get some alcohol, and Taylor went to town and brought back some alcohol. That after supper at Henry Phillips' they went to prayer meeting; and at the church house he gave $5 to Pleas Taylor to get something to drink, and he brought back two pints of alcohol and gave him back a silver dollar, and that he had a $5 bill and $1 bill besides that. That they went to his brother George Sunday's house, and he asked his brother to go with them to play poker and he refused to go. That after they left his brother's, Frank Dandridge shot his pis-

tol three times. That he went to his home and got a lantern, and Henry Phillips was with him. That they met the other two at the old house and started to play poker. That Frank Dandridge reached over and picked up a $5 bill that he had lying in front of him when they were playing. Defendant's testimony as to what later occurred is as follows:

"Q. What did you do? A. I just sat over there a while and asked him to give me my money back, and he said, 'All right.' I told him again to give me my 'money back, and he said, 'All right, I will give it to you,' and pulled a six-shooter, and said, 'I will give you this.' I got up and took the lantern and walked off. Q. When you went back to the house what did you get? A. When I got to the house I thought I would get the gun and arrest them and take them to Will Fool's, and I went to the house and got the Winchester. Q. How came you to walk on down by Henry Phillips'? A. I thought I would head him off before he got to the house. Q. And you did? A. Yes, sir. Q. How did you get out into the field? A. Well, I went down that lane, and I went off down this way, and I went up right there, and the boys came right there, and Frank Dandridge commenced shooting; shot twice. Q. How many times did you shoot? A. Three times. Q. What did he do with the pistol? A. Henry was standing there, and Henry went stooping over there, and when he raised up I just walked close to him, and Henry had the gun, and I told him, 'Lay your gun down!' and Henry threw over the gun, and I walked over and picked up the gun. Q. When you got the gun, did you tell your sisters what you were going to do with it? A. Yes, sir.

"Mr. Disney: Object to what he told his sisters as self-serving.

"The Court: Exception sustained.

"Mr. Crump: The defendant now offers to prove by the witness on the stand, if permitted by the court, that

when he went to his home and got the gun that he told his sisters Frank Dandridge robbed him of his money, and he was going down and arrest Frank Dandridge, and take him to Will Fool, a deputy sheriff."

The record is voluminous, but the foregoing statement is sufficient for the purpose of this opinion.

*J. H. Childers* and *Crump, Bailey & Crump,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen. for the State.

DOYLE, P. J. (after stating the facts as above). The plaintiff in error, James Sunday, was convicted of murder in the district court of Muskogee county, and in pursuance of the verdict of the jury he was sentenced to imprisonment in the penitentiary for life at hard labor. From the judgment, he appeals.

The main contention in this case is that the trial court erred in not permitting the defendant to prove by Eva Sunday and Callie Sunday "that he at the time he got the gun stated that Frank Dandridge had robbed him of $6, and that he was taking the gun with the intention of arresting Frank Dandridge, and turning him over to Deputy Sheriff Will Fool."

Counsel for the defendant in their brief state:

"That if the defendant's testimony was true, Frank Dandridge was guilty of the crime of robbery or grand larceny, and if the defendant, knowing the crime to have been committed in his presence by Dandridge, went to his home for his gun in order to arrest Frank Dandridge and deliver him to the deputy sheriff as he testified, and afterwards met Dandridge, and the other two men in a field with the intention to arrest him, then and in this event the defendant was in the field for a lawful purpose, and he

had a right to defend himself against any assault made upon him by Dandridge. If upon the other hand he went to his home for his gun with the purpose and intent to kill Frank Dandridge, then he was not in the field for a lawful purpose. Therefore his intention in procuring the gun was the vital question to be determined by the jury under the evidence, and what the defendant said to his sisters at the time of procuring the gun was explanatory of his intent, and was admissible as a part of the *res gestae.*"

In support of this contention counsel cite *Koller v. State,* 36 Tex. Cr. R. 496, 38 S. W. 44, wherein it was held by the Court of Criminal Appeals of Texas that:

"Where it appeared that deceased had spoken insulting words to defendant, and that the latter went home to procure a gun, and returned therewith, and shot deceased, declarations, made by defendant at the time he went for the weapon, that he did not intend to kill deceased, but merely to make him retract the insult, were admissible as *res gestae.*"

And the case of *Irvine v. State,* 104 Tenn. 132, 56 S. W. 845, in which the Supreme Court of Tennessee held that:

"Statements made by the defendants to their mother, when leaving home, armed, in search of deceased, who had insulted her, that they were not going to hurt any one, but were going to beat deceased, when they killed him a short time afterwards, were admissible as part of the *res gestae.*"

Counsel for the state urge:

"That the statement made by defendant to his sisters was not *res gestae,* and was properly excluded as 'self-serving declaration.'"

Self-serving declarations are not admissible for the defense, unless they form a part of the *res gestae.* Declarations as a part of the *res gestae* are regarded as verbal

facts indicating a present purpose and intention, and therefore are admitted in proof like any other material facts. Prof. Wigmore says:

"Statements of design or plan are in general admissible, so far as the design or plan is relevant to show the doing of the act designed. Accordingly, it has never been doubted that the threats of an accused person are admissible to show his doing of the deed threatened, so also the threats of the deceased, on a charge of homicide, are by most courts admitted to show the deceased to have been the aggressor. Upon the same principle, the expressions of plan, by the accused, not to do the thing charged, or to do a different thing, are equally admissible. Statements before the act, asserting malice or hatred, are always received against an accused, except so far as the time of feeling is so remote as to make it irrelevant. Is there any reason why prior statements in favor of the accused—for example, of good feeling towards the injured party, or of fear of him as an aggressor—should not be equally admissible? Conduct offered as circumstantially evidential does not seem to be objected to. But statements asserting directly the existence of such feelings are by some courts treated as inadmissible, so far as they do not accompany the very act charged. It is argued that the party must not be allowed to 'make evidence for himself.' But this objection applies equally to many classes of statements under the present exception, and is yet not thought of as fatal. Moreover, the notion of 'making,' that is, 'manufacturing,' evidence, assumes that the statements are false, which is to beg the whole question. Then it is further suggested that at any rate the accused, if guilty, may have falsely uttered these sentiments in order to furnish in advance evidence to exonerate him from a contemplated crime. But here the singular fallacy is committed of taking the possible trickery of guilty persons as a ground for excluding evidence in favor of a person not yet proved guilty; in other words, the fundamental idea of the presumption of innocence is repudiated. We elaborate this presumption in painful and quibbling detail; we

expend upon it pages of judicial rhetoric; we further maintain, with sentimental excess, the privilege against self-crimination; in short, we exhaust the resources of reasoning and strain the principles of common sense to protect an accused person against an assumption of guilt in the most violent form. Because (we say) this accused person might be guilty and therefore might have contrived these false utterances, therefore we shall exclude them, although without this assumption they indicate feelings wholly inconsistent with guilt, and although, if he is innocent, their exclusion is a cruel deprivation of a most natural and effective sort of evidence. To hold that every expression of hatred, malice, and bravado is to be received, while no expression of fear, good will, friendship, or the like, can be considered, is to exhibit ourselves the victims of a narrow whimsicality, which might be expected in the tribunal of a Jeffreys, going down from London to Taunton with his list of victims in his pocket, or on a bench 'condemning to order,' as Zola said of Dreyfus' military judges. But it was not to have been anticipated in a legal system which makes so showy a parade of the presumption of innocence and the rights of the accused. The question-begging fallacy about 'making evidence for himself' runs through much of the judicial treatment. There is no reason why a declaration of an existing state of mind, if it would be admissible against the accused, should also be admissible in his favor, except so far as the circumstances indicate plainly a motive to deceive. Statements of intent or motive, at the time of the act charged, are of course admissible under the present exception. Whether in strictness the principle properly involved is the present one, or that of the verbal act doctrine, is perhaps open to question. Practically there can be little difference in the result, for, under either principle, the statements must relate to the present state of mind at the time of the act. Most courts treat the question in terms of the verbal act doctrine. The statements, as already indicated, ought to be admissible as well in favor of the accused as against him." (Wigmore on Evidence, sec. 1732.)

In *Morehead v. State,* 12 Okla. Cr. 62, 151 Pac. 1183, it is said:

"No fixed measure of time or distance from the main occurrence can be established as a rule to determine what shall be a part of the *res gestae.* Each case must necessarily depend on its own circumstances to determine whether the facts offered were really part of the same continuous transaction."

See *Wesley v. State,* 11 Okla. Cr. 292, 146 Pac. 450; *Price v. State,* 1 Okla. Cr. 369, 98 Pac. 447.

In our opinion, the statements made by the defendant to his sisters were admissible as a part of the *res gestae.* They were so connected with it as to constitute a part of the transaction which ended in the death of Dandridge; but while holding this, we are clearly of the opinion that the rulings of the trial court in this regard do not constitute reversible error. Because, assuming the defendant's account of the difficulty at the log cabin to be true, it does not show or tend to show that a felony had been committed. At most, the taking of the $5 bill would be only petty larceny. There was no element of robbery in the transaction.

Upon the undisputed facts there was not the slightest authority in the defendant to arrest the deceased. The law protects its citizens in the enjoyment of liberty, and prescribes the mode and manner by which they may be arrested and brought to trial, intrusting the execution of the same to its peace officers. Arrests can be made by no one for alleged offenses, unless upon a warrant based upon an affidavit issued by a judicial officer, except those enumerated in sections 5654, 5656, 5658, 5659, and 5660, Rev. Laws 1910. A private person attempting to arrest a felon without warrant must, before making the arrest, inform

.the person to be arrested of the cause thereof. Section 5661, Rev. Laws 1910. Unless he does so, the party attempted to be arrested has the right to resist the arrest. In this case the defendant did not make his purpose and reason for attempting to make the arrest known.

The foregoing discussion disposes of all questions in the case. No objection was made or exception saved to the instructions given by the court, which fully and fairly covered the law of the case. Upon a careful examination of the whole record, we do not find any error prejudicial to the defendant, and we think it would have been a miscarriage of justice, if upon the evidence in this case any other verdict had been rendered.

The judgment of the district court of Muskogee county herein is affirmed.

ARMSTRONG and MATSON, JJ., concur.