## L. J. FILLER v. STATE.

No. A-3813.   Opinion Filed April 30, 1923.
(214 Pac. 568.)
(Syllabus.)

1.    Appeal and Error—Preliminary Examination—Indictment and Information—Information Charging Larceny Need not be Ident-

ical with Preliminary Complaint—Presumed Evidence at Pre-
liminary Warranted Charge in Information Although Variance in
Ownership of Property Stolen—Examining Magistrate May Hold
Accused for Offense Originally Charged or any Other as Facts
Warrant. An information charging larceny need, not be identi-
cal in wording with the preliminary complaint. Where the pre-
liminary complaint charged that the property stolen belonged
to one, and the information in district court stated it belonged
to another, it will be presumed the evidence taken at the pre-
liminary hearing warranted the charge as it appeared in the
information.

(a) An examining magistrate may hold the accused for **trial**
for the offense originally charged, or for any other offense, as
the facts may warrant. Section 2497, Comp. Stat. 1921.

2. **Evidence—Res Gestae—Evidence of What Was Said and Done
During Period Directly Connected with Larceny.** In a case in-
volving the larceny of a large quantity of oil well casing, where
the preparations made to steal it and the incidents connected
with the actual taking and asportation of the casing continued
over an extended period of time, what was said and done dur-
ing all this period directly connected with and explanatory of
such taking and asportation by any of the persons implicated
is admissible as a part of the res gestae.

3. **Evidence—Evidence of Statements by Witness as to Consum-
mation of Crime to Determine Whether Accomplice Requir-
ing Corroboration.** Where there is evidence indicating that a
witness is, or may have been, an accomplice, and other evidence
indicates that he was not criminally implicated, but acted as an
informer, evidence by third persons of what was said by the
witness in relation to the different steps taken to take and haul
away the property may be admissible to determine whether or
not the witness was in fact an accomplice' requiring corrobor-
ation.

Appeal from District Court, Payne County; Arthur R.
Swank, Judge.

L. J. Filler was convicted of grand larceny, and he ap-
peals. Affirmed.

J. M. Springer and E. G. Wilson, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen.,
for the State.

BESSEY, J.  L. J. Filler, plaintiff in error, was by information filed in the district court of Payne county on January 2, 1920, charged jointly with Joe Golden, J. J. Marcus, and Aaron Berry with the stealing and carrying away of 48 joints of 20-pound, 6 5-8-inch oil well pipe, the property of the Pennhoma Oil Company, of the value of $1,680. The plaintiff in error, hereinafter referred to as the defendant, asked for a severance, which was granted, and he was put upon trial January 21, 1920, resulting in a verdict of the jury finding the defendant guilty as charged, without fixing the punishment. On January 29th the court rendered judgment upon the verdict and fixed the defendant's punishment at confinement in the state penitentiary for a period of one year. From this judgment he appeals.

In order to make clear a discussion of the assignment of error urged in this case, a statement of the testimony in narrative form is deemed advisable.

J. T. Turner was a pumper on an oil lease near Quay, Okla., for the Pennhoma Oil Company. His duties were to pump the oil on the lease and look after and take care of the personal property belonging to the corporation, including the casing or oil pipe charged to have been stolen. Turner testified that some months prior to the taking of this casing Aaron Berry came to him to buy some rope and other junk there on the premises. A little later Berry came back to the lease in company with the defendant Filler, and Filler asked Turner if he would sell him this pipe. Turner replied that he had no authority to sell it, whereupon Berry urged him to make the sale without authority of the owner, stating, in effect, that it could be done in such a way that Turner could profit by the sale and run no risk. Berry told Turner that he would give him $1,000 if he would give Berry and the defendant a

chance to get away with it. It was suggested that Turner might leave the lease for a sufficient length of time to enable them to do this, and Berry offered to buy Turner a ticket to any point to which he might desire to go. To this proposition Turner refused to give his assent. The defendant, in company with Berry and Joe Golden, returned a third time to the lease and again insisted upon buying the pipe, suggesting that Turner give them a bill of sale for it and leave the country. Again Turner refused. On the day before the pipe was carried away the defendant again went to the lease, in company with Golden and Marcus. The defendant left his companions standing some distance away and went to Turner in the engine room and again talked to him about the pipe. In the course of this conversation Turner said that he was about to quit his job and leave the lease, and later Turner heard the men discussing the situation and heard them state that when the new man came on they would frame up an order purporting to come from the owner, and in that manner get the pipe. After the men left Turner went in to the county seat and informed the sheriff and others there with him what had taken place. The sheriff instructed Turner to go back to the lease, and, if the parties came to take the pipe, not to interfere with them, but call up the sheriff's office and apprise him of what was being done. The sheriff also suggested that if they again offered him money he should take it and pretend to fall in with their scheme. On the day following this conversation with the sheriff the defendant again came to the lease, and Turner told the defendant that he had decided to let him have the pipe. Later, following the suggestion of the sheriff, Turner accepted a $1,000 check from the defendant.

It would extend this narrative to too great length to recite in detail all the circumstances connected with the theft. Briefly stated, the defendant and his coconspirators made arrange-

ments for a car and for teamsters to haul this pipe, and they loaded part of it and transported it to Yale, and were in the act of loading the pipe into a car for shipment when the officers came and apprehended them, the sheriff acting on information furnished him by Turner, according to previous instructions. Before the arrest one of the party had wired for money, $1,000, to pay Turner. The local bank at Yale refued to honor the wire. Then one of them gave Turner a check for $1,000, payable to the defendant and indorsed by him. The bank likewise refused payment on this check.

Turner's testimony in regard to these transactions was in many respects corroborated by a number of other witnesses. There was also evidence to support the theory of the defendant to the effect that Golden and Berry had been engaged in the buying and selling of pipe, junk, and oil supply materials, and that they had had some dealings with the Oklahoma Pipe & Supply Company; that Turner represented to them that he was in full charge of the property and had authority to sell this particular pipe; that they made some inquiry and found that he had been on this lease for some months and appeared to be in full charge there; that they believed Turner had authority to sell the pipe, and that they made the purchase in good faith, and that their attempt to procure the $1,000 was for the purpose of making their payment to Turner, in accordance with their agreement with him.

There are but two assignments of error seriously urged in defendant's brief:

First. That the preliminary complaint charged that the pipe in question was the property of the Jennings Bros. Oil Company, and that the information filed in the district court charged that the pipe belonged to the Pennhoma Oil Company, and that there was therefore a fatal variance between the

preliminary complaint and the information upon which the defendant was tried; that for this reason the information was not supported by a preliminary examination, as contemplated by the provisions of section 17, art. 2, of the Constitution of Oklahoma. This section provides:

"No person shall be prosecuted for a felony by information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination."

The offense charged in the original preliminary complaint need not be charged as set out in the information. Section 2497, Comp. Stat. 1921, provides as follows:

"If, however, it appear from the examination that any public offense has been committed, and that there is sufficient cause to believe the defendant guilty thereof, the magistrate must in like manner indorse on the complaint an order signed by him to the following effect:

"It appearing to me that the offense named in the within complaint mentioned (or any other offense, according to the fact, stating generally the nature thereof), has been committed, and that there is sufficient cause to believe the within named A. B. guilty thereof, I order that he be held to answer the same."

In the case of Ponosky v. State, 8 Okla. Cr. 116, 126 Pac. 451, there was a complaint filed before the magistrate charging the accused with stealing one pale red heifer, branded NN on the right hip, the property of H. L. Smaland. The examining magistrate held the accused to answer in the district court. In that court the information charged the accused with stealing one cow and one calf, the property of S. L. Noland. The accused, as in this case, contended that the information was not supported by a preliminary hearing, as contemplated by the Constitution and statutes, but the court held

to the contrary. A discussion of this question need not be extended further than to say that the same question was fully and carefully considered in an opinion written by Judge Matson in the case of Agent v. State, 18 Okla. Cr. 281, 194 Pac. 237, wherein he cited the case of Ponosky v. State, supra, and further stated:

; "Under the provisions of section 5680, Revised Laws 1910, the examining magistrate was authorized to bind the defendant to answer either the offense named in the preliminary complaint or 'any other offense according to the fact'; and this court will presume, in the absence of a contrary showing, that the amended information in this case was supported by the facts disclosed by the evidence of the state at the preliminary hearing."

The authorities cited in the last-named case fully support the conclusions announced above. The identity of the pipe was definitely established, so as to preclude the possibility of another prosecution for the same offense.

It is next urged that the court erred in permitting the state to show by the sheriff and others the explanations made by the witness Turner to the sheriff with reference to the incidents leading up to the actual taking of the pipe. This conversation was had in the sheriff's office, while the preparations to remove and ship the pipe were in progress, and was in the absence of the defendant or any of his coconspirators, unless it may be said that Turner himself was a coconspirator and implicated in the theft. It is earnestly contended that this testimony was inadmissible and prejudicial for the reason that it was hearsay, and not any part of the res gestae. The testimony of which complaint is made is as follows:

"Q. You may state your name. A. O. R. Lilley.

"Q. What official position, if any, do you hold in Payne county? A. Sheriff of Payne county.

"Q. Mr. Lilley, are you acquainted with J. B. Turner? A. I never met him until the evening of the 13th.

"Q. What was the occasion of your meeting him then? A. He came to my office.

"Q. For what purpose? A. He came to my office in regard to the pipe on that lease.

"Q. What did he say to you at that time? A. He said they was going to steal it, he couldn't stop it, and wanted to know what to, what was the best thing to do.

"Q. What, if anything, did you tell him? A. I told him to just let them start with it, and then phone me; I would get them.

"Q. Anything said about the $1,000 there? A. He said they had offered him $1,000; yes, sir.

"Q. Anything else he said there? A. He said they offered him $1,000 to leave the lease."

Cross-examination of Sheriff Lilley:

"Q. What did you tell Mr. Turner to do when he came over? A. Told him to let them take it.

"Q. Told him to take the $1,000? A. I just told him to let them take it, to phone me as soon as they did.

"Q. Tell him to take the $1,000? A. I believe I did; I'm not sure in regard to that. I told him to let them take the pipe; I says, 'Now phone me just as soon as they take it.'

"Q. Did Mr. Turner tell you he had charge of that lease out there? A. Yes, sir.

"Q. You didn't tell Mr. Turner at that time to forbid them to take the pipe off the lease, did you? A. No, sir."

It will be noted that there were no objections interposed to this testimony of the sheriff.

Examination of Warren Cooper:

"Q. You may state your name. A. Warren Cooper.

"Q. What official position, if any, do you hold in Payne county? A. Undersheriff.

"Q. Were you such undersheriff on the 15th day of November, 1919? A. Yes, sir. * * *

"Q. Now, what was the occasion of Mr. Turner being there [in the sheriff's office], if you know?

"By Mr. Berton: Objected to as calling for a conclusion of the witness, incompetent, irrelevant, and immaterial.

"By the Court: Overruled. Exception allowed.

"A. I was down to Judge Jones' house that night, and they called me up and had me come to the office. I came up there, and these men were all in there. When I came in Mr. Lilley says, 'I want you to hear this.'

"By Mr. Berton: We are objecting to any conversation they had there as hearsay and incompetent, irrelevant, and immaterial.

"By the Court: Overruled. Exception allowed.

"A. 'I want you to hear this statement these men are going to make.'

"By the Court: Who was it that was present? A. Mr. Lilley, Mr. Turner, I believe his name was, Mr. Swin, and this other gentleman, I can't call his name.

"Q. All right, go ahead. What statement was made by Mr. Turner?

"A. Turner says—

"By Mr. Berton: We object, incompetent, irrelevant, and immaterial, and hearsay.

"By the Court: Overruled. Exceptions allowed.

"A. Turner says: 'There's a bunch of men over there that's going to steal some pipe, and I want to know what to do about it. They're going to take this pipe; they have offered me money to leave that lease so they can get that pipe.' * * *

"Q. Now what, if anything, did you hear Mr. Lilley tell Mr. Turner? A. He told him to go back over there, and if they went to removing the pipe to let him know and we could come over there and take care of them."

Examination of C. L. Swin:

"Q. You may state your name. A. C. L. Swin.

"Q. Where do you live, Mr. Swin? A. Stillwater, Okla.

"Q. What official position, if any, do you hold with Payne county? A. County treasurer.

"Q. Mr. Swin, do you know the defendant, L. J. Filler? A. No, sir.

"Q. Did you see him—do you know J. B. Turner, one J. B. Turner? A. Yes, sir.

"Q. Did you see one J. B. Turner in the sheriff's office on or about the 13th day of November, 1919? A. Yes, sir.

"Q. Now, can you tell the jury what the occasion was of your seeing him there? A. I was working in November and December—we were very busy in the office—I was working nights in my office down here. I went to the sheriff's office to get a key, and he was there, so they said to me—

"By Mr. Berton: Wait a minute; we want to object to that, being incompetent, irrelevant, and immaterial and hearsay, not in the presence of the defendant.

"By the Court: Yes; all explanatory matters. Overruled. Exception allowed.

"A. The sheriff says: 'Sit down here a minute, I want to talk to you.' Then it was I met Turner to find out who he was.

"Q. Now, did you hear Mr. Turner say anything about—state what, if anything, you heard Turner state there.

"By Mr. Berton: Same objection.

"By the Court: Overruled. Exception allowed.

"A. Well, there was quite a conversation there, prob-

ably lasted about half or three-quarters of an hour, maybe.

"Q. What was that conversation about? A. Well, it was about the pipe situation, you might say, on an oil lease over by Quay. It seems there had been some parties there that had made a proposal to Mr. Turner that if he would absent himself from the lease they would take the pipe, and he told them—he told us there that evening they had agreed to give him $1,000 for doing that. He was over there talking with the officers, telling the officers about the matter. Sheriff stopped me and asked me if he could take the money and then turn them over to the officers. I told him I didn't know; he better call you.

"Q. What did Turner say further about the pipe going to be stolen, give me some—A. He said they were going to get it anyway; best thing we could do was to catch them. He said they had been up there a dozen times or so.

"By Mr. Berton. We move all this evidence be stricken for the reason it is incompetent, irrelevant, and immaterial, and not in the presence of the defendant.

"By the Court. Overruled. Exception allowed."

The witness Turner at the time he went to the sheriff's office was acting as an informer. If Turner had ever been implicated with the accused and his confederates in the plan to steal this pipe, he 'had abandoned such purpose before going to the sheriff's office.

It may be that the acts and declarations of Turner in informing the sheriff that preparations to consummate the crime were then in progress were a part of the res gestae. Upon that point we are not clear. Even if these acts and declarations of Turner were a part of the principal facts, could the sheriff and others testify to the narration of conditions made by Turner in the absence of the accused?

It appears to be a close question whether third persons may testify to such declarations as in this case, as coming

within the rules laid down by the text-writers and the decisions of the courts. Turner's disclosures to the sheriff and others present were made while the defendant and his confederates were in active preparation to move and ship the pipe out of the state. The fact that Turner informed the sheriff was admissible, but whether Turner should have been permitted to relate in detail the disclosures made, the conversations had with the defendant, and the preparations made to steal the pipe, as being part of the res gestae, is not so clear. These disclosures had no probative force with reference to the taking and asportation of the property, because the defendant admits the taking, claiming that the property was his by right of purchase in good faith. These disclosures to the sheriff were, however, explanatory of the motives indicating that the pipe was not taken in good faith, but with a deliberate purpose to steal it. They were also explanatory of why the sheriff made the subsequent arrests at the time and in the manner in which they were made. The sheriff confirmed what Turner testified to having told him without objection on the part of the defendant. Could he later object to further testimony of such disclosures, given by the deputy sheriff and the county treasurer? And, if their testimony was in fact incompetent, was it prejudicial?

It is claimed by the state that all this testimony was necessarily explanatory of the taking as it afterwards occurred, that it was explanatory of the conduct of Turner before and during the asportation of the pipe, as well as explanatory of the conduct of the parties alleged to have been implicated in the taking, and that it was therefore a part of the res gestae, coming within what is sometimes called the "verbal act" rule.

Appellate courts and law text-writers have often attempted to give an all-comprehensive definition of the term "res gestae." So far as we know, no satisfactory, lucid definition

has ever been given, embodying all of the applications and limitations of the principle sought to be defined. Recognizing the difficulty or futility of framing such a definition, this court will make no attempt to do so; but in this and many other cases where the attending facts are such that, in keeping with common sense and sound reasoning, the court and jury should know all the attending facts in order to properly comprehend and analyze the motives and acts of the interested parties, and where such facts and circumstances and declarations are so closely connected with the main issue as to be an integral part of the offense, and such issue cannot be intelligently determined without considering such attending facts and declarations, it would seem that such attending incidents would be a part of the res gestae.

Assuming that the witness Turner was not a confederate, he was one of the main agencies, one of the chief actors, in the taking and asportation of the property stolen. Although an informer, he assisted the perpetrators to carry out and consummate the offense throughout its various stages. It would seem then that his acts and declarations, as well as the acts and declarations of the others with whom he was working, covering the period of the taking and asportation, might properly be considered a part of the res gestae.

It has been held that it is not essential to the admissibility of a statement or act as a part of the res gestae that it should have been made or done at the place where the principal fact occurred. 3 Wigmore on Evidence, 1725, 1730, 1731, and citations and annotations there found; 22 Corpus Juris 458, and cases cited.

Facts, circumstances, and declarations, elucidating the main issue must be well calculated to unfold the nature and quality of the main fact, in such a manner as to harmonize with it and to obviously constitute a part of the whole transaction, in

order to be admissible. Whether the testimony is of such a nature must to some extent rest in the sound discretion of the trial court. Chapter on "Verbal Acts," 3 Wigmore, § 1768, et seq.; 22 Corpus Juris, 459, 460, and cases there cited; State v. McKenzie, 228 Mo. 385, 128 S. W. 948.

The declaration and the extent of the transaction so shown is not necessarily confined to a particular point of time, but may extend over a longer or shorter period, according to the nature and character of the transaction. So. Ry. Co. v. Lewis, 165 Ala. 555, 51 South. 746, 138 Am. St. Rep. 77; The Theodore Roosevelt (D. C.) 154 Fed. 155; 1 Wharton on Evidence, § 259; Underhill on Crim. Evid. § 97; 22 Corpus Juris, 450.

The case of State v. Gabriel, 88 Mo. 631, involved the larceny of sheep; the transaction being made up of a variety of incidents extending over a period of several days, and not at an end until the sheep were branded. All acts which occurred or words which were uttered during that period of time, tending to elucidate the principal fact in dispute, namely, the motive with which the sheep were branded, were admitted as part of the res gestae. In the opinion the court said:

"If the act of Gabriel in driving the sheep towards the residence of Glasgow before the time of the commission of the alleged larceny possessed any probative force, then his declarations which accompanied that act constitute a part of the res gestae giving, as they did, quality to the act and clothing the mere nude act with the garb of legal intelligibility. The doctrine is well settled that whatever words depict the character of the principal fact, shed upon it the proper light when it is brought before the camera of judicial investigation, are 'verbal acts, indicating a present purpose and intention, and are therefore admitted in proof like any other material facts.' 1 Grlf. Evid. § 108, and cases cited; * * * Whart. Crim. Evid. §§ 262, 691; * * * 1 Starkie's Evid. (6 Ed.) 65."

In the case of Roddie v. State, 19 Okla. Cr. 63, 198 Pac. 342, Presiding Justice Doyle, quoting from Underhill on Criminal Evidence, §§ 99 and 100, said:

"If the declaration meets the requirements of the rule now under consideration—that is, if it explains or illustrates a relevant fact—it is not incompetent merely because its utterance precedes the actual commission of the crime. Evidence is always relevant which shows that the accused made preparations to commit a crime, and from such preparative actions a criminal intention may, with justice, be 'inferred.'

"Declarations accompanying these acts of preparation are received to explain and unfold their significance, and indirectly to illuminate the subsequent language, conduct, and state of mind of the accused."

To the same effect was the holding in Sunday v. State, 14 Okla. Cr. 620, 174 Pac. 1095.

In modern times the scope of the admissibility of evidence as a part of the res gestae has been enlarged, in an effort to afford the triers of fact all reasonable means of ascertaining the truth, instead of withholding from them all information possible by the rigid application of rules of exclusion. The question now is not how little, but how much, logical, competent proof is admissible. Prickett v. Sulzberger Bros., 57 Okla. 567, 157 Pac. 356. In the last-mentioned case the court quoted from Wiggin v. Plumer, 31 N. H. 251, as follows:

"When a fact is offered in evidence, the whole transaction, if it consists of many parts, may and ought to be proved. Every additional circumstance proved may vary the effect of the evidence, may neutralize it, or give it point. What is then said by the parties, and what is said by others to them, relative to the subject of the transaction, is a part of the transaction itself."

In the Wiggin Case the facts, however, were held not to come within the rule stated.

We recognize that in applying the res gestae rule to the relating of the disclosures made by Turner, the informer, as told by the sheriff, deputy sheriff, and county treasurer, we have probably approached the limit of the rule. We do so because the disclosures so made of the plans to take this pipe were so closely connected with its subsequent taking, and because the disclosures so made were necessary to fully explain the subsequent taking and the motives and actions of the parties. This is apparent because the inquiries made by both the defendant and the state concerning these disclosures make it manifest that this showing was essential to a proper determination of the motives and intent of both Turner and the accused parties at the time of the asportation. To exclude these disclosures made to the sheriff and others would be contrary to common sense and sound reason, and calculated to defeat the ends of justice. All rules of evidence are designed to facilitate the reception of such proof as will safely and correctly inform the court and jury of the true facts and circumstances at issue, and ordinarily where technical rules interfere with a lucid, safe, and reasonable explanation of the main facts at issue a strict construction of such technical rules should yield to a more rational construction.

Prof. Wigmore, in his admirable treatise on Evidence, vol. 3, pp. 2247-2257, aptly stated the difficulties inherent in this case, relating to admissibility of hearsay statements as a part of the res gestae:

"The exposition of this exception [the admission of hearsay evidence] is to be approached with a feeling akin to despair. There has been such a confounding of ideas and such a perverse and indiscriminate use of the shibboleth 'res gestae' that it is perhaps impossible to disentangle the real basis of the principle involved. * * * There are few problems in the law of evidence more unsolved than what things are to be embraced in those occurrences that are designated in the law of the res gestae. * * * There is a lamentable waste of time by

Supreme Courts in here attempting either to create or to respect precedents. Instead of struggling weakly for the impossible, they should insist that every case should be treated upon its own circumstances. They should, if they are able, lift themselves to the even greater height of leaving the application of the principle absolutely to the determination of the trial court. Until such a beneficent result is reached their lucubrations of the details of each case will continue to multiply the tedious reading of the profession.''

There is another theory upon which the disclosures made by the witness Turner to the sheriff and others in the office concerning the offer made to Turner by the defendant and his confederates to induce Turner to aid in the theft and asportation of the pipe would be admissible. Turner may have been a coconspirator with the defendant and his confederates. It may be that he abandoned his purpose to aid and assist them, and, in order to protect himself, decided to inform the sheriff before the purpose of the conspiracy was accomplished and the theft consummated. This would raise an issue of whether or not Turner was an accomplice, and the disclosures made by Turner to the sheriff and others would be explanatory of that issue, irrespective of whether they were a part of the res gestae or not. If Turner was an accomplice, it would be necessary that his testimony be corroborated, and these disclosures made to the sheriff and others, as testified to by them, would to some extent corroborate or explain the evidence given by Turner, the accomplice, if such he was. Upon this theory this evidence would be admissible.

In the light of what has been said, under the circumstances here we conclude that the disclosures made to the sheriff and others by Turner, in the manner and at the time indicated, were an integral part of the offense, susceptible of proof by those who heard them.

The judgment of the trial court is affirmed.

DOYLE, J., concurs in the opinion.

MATSON, P. J. (concurring). In my opinion the witness Turner should have been permitted to testify that after he learned of the conspiracy of Filler and his confederates to steal the pipe in controversy he (Turner) went to Stillwater and saw the sheriff of Payne county. The details of the conversation with the sheriff in the absence of Filler, Turner not being a coconspirator, were hearsay evidence, in my opinion, and for that reason incompetent, and should have been rejected, as further I believe they did not form part of the res gestae. The testimony of the sheriff as to what Turner told him on that occasion was admitted without objection or exception. Further, the testimony of Turner that after visiting and conversing with the sheriff he afterwards acted on the instructions given him by the sheriff was also competent, because in my opinion it then became material to the issues as to whether or not Turner afterward joined the conspiracy with or without criminal intent. Did or did not Turner accept the $1,000 check for the purpose of aiding the defendant with others to accomplish the taking and asportation of the pipe or for the purpose of assisting the officers to detect, apprehend, and punish the real offenders? The intent with which Turner acted therefore became material, and the fact that he acted under instructions from the sheriff (without detailing what those instructions were) was in my opinion competent for the jury to consider in order to determine whether or not Turner was or was not acting as an accomplice in absenting himself from the premises and in accepting the $1,000 check.

A large portion of this objectionable evidence (the record shows) was admitted without objection made or exception taken. I cannot see that under the proof in this case a different result would ensue were a new trial granted and the objectionable evidence rejected.

Suppose Turner's testimony was limited to detailing the matters and things that occurred between him and Filler prior to his visit to the sheriff, then the fact of such visit (without detailing the conversation between him and the sheriff), then the further fact that he afterward acted upon the instructions of the sheriff (without detailing what those instructions were), and then his subsequent meetings and conversations with Filler and his coconspirators; would not the inferences that would naturally follow such competent evidence be inevitably equivalent to the details of his conversation with the sheriff? In other words, were Turner's testimony limited to the scope above indicated, could the jury have arrived at any other conclusion than that Turner was not an accomplice of Filler and those jointly informed against with him? That Turner was not an accomplice was the logical result in either instance, and the declarations of Turner to the sheriff had probative force only to show that he was not an accomplice. Can it then be said that, because of the improper admission of this evidence, the error complained of has probably resulted in a miscarriage of justice as required by section 2822, Compiled Statutes 1921? I cannot see that it has. For such reason I concur in the conclusion that the judgment should be affirmed.