## GEORGE LOVE v. STATE.

No. A-2996.    Opinion Filed January 20, 1919.

(177 Pac. 387.)

1. HOMICIDE—Manslaughter in First Degree—Sufficiency of Evidence. In a homicide case the evidence considered, and held sufficient to support the verdict of manslaughter in the first degree, and that no reversible error was committed on the trial.

2. ARREST—Homicide—Commission of Offense—Resistance—Degrees. A peace officer has the right without a warrant to arrest a person who is committing a public offense in his presence, and a person so arrested has no lawful right to resist. The officer being in the right, and in the discharge of his duty, the person resisting arrest does so at his peril, and in so doing if he kills the officer, he is guilty of murder, if he knew that the person attempting to make the arrest was an officer, and guilty of manslaughter in the first degree if he did not know it.

*Appeal from District Court, Carter County;*
*W. F. Freeman, Judge.*

George Love was convicted of manslaughter in the first degree, and appeals. Affirmed.

*J. B. Chapman* and *Brown & Brown,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J. Plaintiff in error, George Love, and his brother Mose Love were jointly indicted by the grand

jury of Carter county for the murder of one Oscar Alexander. They were jointly tried, and the jury rendered verdicts, finding Mose Love not guilty; and finding George Love guilty of manslaughter in the first degree, fixing his punishment at eight years in the penitentiary. From the judgment rendered upon the verdict he prosecutes this appeal.

The facts as shown by the testimony for the state, brifly stated, are as follows: George McLaughlin, constable of Morgan township, Carter county, Dow Brazil, deputy United States marshal, Tom Adams, and Oscar Alexander, the deceased, went, on the afternoon of August 31, 1916, to the home of Mr. Cox, in the Hoxbar community, for the purpose of intercepting and arresting the plaintiff in error and his brother, Mose Love, who, said officers had information, were transporting intoxicating liquor. The officers stayed that night in the neighborhood, and the next day took up certain positions along the road which the Love brothers were expected to travel, and remained all day and into the night following, until McLaughlin fired a warning shot and the four officers together in their car went in pursuit of the Love wagon. Having gone some distance eastward they heard the wagon cross a bridge going north, and they took up positions along the roadside and waited for the wagon to come along; as the wagon approached, McLaughlin said, "Stop! I want to see what is in the wagon; I'm an officer,"—and threw a searchlight on the wagon, and the man on the wagon said, "Throw that light on me again, you son of a bitch, and I will set you on fire." He again said that he was an officer, and the man said, "It don't make any difference." Dow Brazil also told them to stop, saying that he was a United States officer, and that he wanted to see what they

had in the wagon. Oscar Alexander, the deceased, threw a searchlight on the wagon. Then two shots were fired from the wagon, the officers then commenced to shoot, then George Love fired the shot that killed Oscar Alexander. The officers found 19 cases of whisky, each case containing 24 pint bottles. They arrested the plaintiff in error, and asked him where he brought the whisky from. He answered that he did not have any statement to make.

For the defense Mose Love testified that he was driving the wagon, which was loaded with 19 cases of whisky covered by a wagon sheet and three or four quilts; that he and his brother George had been down on Hickory creek fishing, and a man in a Ford car, whose name they did not ask, hired them to haul the whisky to Provence, saying that he would be there to receive it; that there was a loaded double-barrel shotgun in the wagon, which belonged to his brother George; that about 10 o'clock that night a man standing by the roadside flashed a light and said, "Stop, you damn son of a bitch," and then several shots were fired at the wagon, and he was hit and fell off of the wagon, and soon thereafter he heard his brother George fire the shotgun; that the shotgun was fired only one time; that the officers fired 12 to 15 shots before his brother fired the shotgun. The plaintiff in error testified that he was lying down crossways on the boxes in the wagon, and several shots were fired, one striking him in the foot; that he then picked up his shotgun and fired one shot in the direction of the gun flashes; that before he fired the shot his brother Mose was hit and fell off the wagon; that before the shooting commenced he heard somebody say, "Hold up there, you damn son of a bitch."

On cross-examination he stated that he had been convicted in that court in a homicide case, but did not serve

the sentence, and had been convicted in the federal court at Ft. Worth for having whisky in his possession for the purpose of transporting it to the Indian Territory.

W. H. Darter testified that he heard the shooting, and that towards the last of the rapid shots he heard a different and louder report.

Bill Slater testified that he resided with W. H. Darter, and heard the shooting; that there were about eight or ten shots fired rapidly, that sounded very much alike, and towards the last he heard one different and louder report.

Henry McNeely testified that he lived about 200 yards from the scene; that he was sitting in the door about 10 or 11 o'clock, and heard the shooting; that he was familiar with firearms and the different reports made by different kinds of guns, and could distinguish between the report made by a shotgun when fired and a rifle and pistol; that he heard between 12 and 15 pistol or Winchester shots, which were very rapid, and after that heard a single shot from a shotgun.

Annie Hawkins testified that she heard the shooting, and there were a number of shots fired one right after the other so fast that she could not count them, and towards the last she heard a big gun fire.

J. H. Hargis testified that he heard several shots, seemed to be five or six guns cracking, and towards the last he heard one dead sound.

Winnie Rosalis testified that she heard an awful noise —sounded, "Pop, pop!" like guns and pistols, very fast; that along towards the last of the popping there was a big gun fired.

Ben Henshaw testified that he heard the shooting; that there was something like five or six that sounded like pistol shots, and towards the last he heard a shotgun.

The errors assigned are that the verdict is contrary to law, and is not sustained by the evidence, and that the court erred in giving certain instructions, and in refusing to give instructions requested.

An examination of the record discloses that the evidence is ample to sustain the conviction. Our Criminal Code provides that:

"A peace officer may, without a warrant, arrest a person: First, for a public offense, committed or attempted in his presence" (section 5654, Rev. Laws 1910)
—and further provides that:

"When arresting a person without a warrant, the officer must inform him of his authority and the cause of arrest, except when he is in actual commission of a public offense, or is pursued immediately after an escape." (Section 5657, Rev. Laws 1910.)

Under our statutes a peace officer has the right, and it is his duty, to arrest one who is committing a public offense in his presence and to use such force as may be necessary to effect the arrest, and if the person committing the offense resists arrest, and in so doing kills the officer, he is guilty of murder, if he knew that the person attempting to make the arrest was an officer, and at least guilty of manslaughter in the first degree if he did not know it.

The officer being in the right, and in the discharge of his duty, the person resisting arrest does it at his peril, and if he kills, he is guilty of murder or manslaughter, as it may appear that he knew or did not know the character

in which the officer was acting. In *Collegenia v. State*, 9 Okla. Cr. 425, 132 Pac. 375, it is said:

"An arrest by a peace officer without a warrant for a public offense committed or attempted in his presence, made in substantial compliance with the terms of the statute, is a legal arrest, which no one can lawfully resist, and the officer may use whatever force is reasonably necessary to prevent an escape and secure the offender, but the officer must use no more force and violence than is reasonably necessary to secure the arrest."

However, if the lawful power of arrest is exercised in such wanton and unlawful manner as to make such officer a trespasser, resistence will be justified. This was the theory of the defense made in this case. The instructions given by the court fairly and fully presented the law of the case, including that of the defense made. The instructions requested were properly refused. Finding no material error in the record, the judgment appealed from is affirmed.

ARMSTRONG and MATSON, JJ., concur.