## LEROY SCOTT v. STATE.

No. A-5339.    Opinion Filed March 7, 1925.
(233 Pac. 776.)

(Syllabus.)

1.  **Continuance—Accused Entitled to Reasonable Time to Prepare for Trial.** A defendant charged with crime is entitled to a reasonable time to prepare for trial, and what is a reasonable time will depend upon the circumstances surrounding a particular case.

2.  **Jury—Negroes not to be Excluded from Jury Service Solely on Account of Color—On Challenge to Panel, Whether Negroes Were Excluded Because of Color, Question of Fact—Duty of Court to Hear Evidence.** Under section 1, article 14, of the Amendments to the federal Constitution providing for the equal protection of the law, negroes, otherwise qualified, may not be excluded from jury service solely on account of their race or color, and when a negro is charged with violating the criminal laws of the state, and in apt time challenges the panel of the jury on the ground that persons of African descent were excluded therefrom solely on account of race or color, and offers evidence in support of such challenge, it is the duty of the court to hear the evidence, and it is then a question of fact whether negroes were excluded because of their race or color.

3.  **Same—Officers Selecting Jurors May Exercise Discretion, but not Exclude Negroes Solely Because of Color.** Officers charged with the duty of selecting and summoning jurors may exercise their discretion in selecting those persons who in their judgment are competent and qualified to serve as such jurors, provided that they do not exclude competent persons who are negroes solely on account of their race or color.

4.  **Same—Evidence not Sufficient to Quash Panel of Jury Because Negroes Had Been Illegally Excluded.** For evidence which did not sustain a motion to quash the panel of the jury upon the ground that negroes had been illegally excluded therefrom, see opinion.

5.  **Appeal and Error—Venue—Ruling Denying Change of Venue not Reversed Except on Showing of Abuse of Discretion.** The grant-

ing or refusing of a change of venue is discretionary with the trial court, and this court will not reverse a ruling of the trial court denying an application, unless there is an abuse of discretion shown.

Appeal from District Court, Pittsburg County; Enloe V. Vernor, Judge.

Leroy Scott was convicted of murder and punishment assessed at death, and he appeals. Affirmed.

Don Emery and I. P. Keith, for plaintiff in error.

EDWARDS, J. For brevity the plaintiff in error will be referred to as the defendant; he assigns error as follows: First, that he was not allowed sufficient time for counsel to prepare his defense; second, that negroes were excluded from the jury panel for the sole reason that they were negroes; third, that the court erred in denying a change of venue.

The evidence on the part of the state shows the following state of facts: That Frank Daniels, the slain man, was a driver of a Buick service car at McAlester. On the night of July 23, 1924, after the trains on the Rock Island had passed, a colored man, who had arranged for a drive, got in the car driven by the deceased, and Daniels then drove north from McAlester. The following day, July 24th, a purse which had belonged to Daniels was found in a ditch by the side of the Jefferson Highway, near the town of Crowder, and about the 27th of July the body of Daniels was found in Gaines creek about a fourth or a half mile south of the bridge on the Jefferson Highway. Also blood was found on the south side of the bridge. There were wounds on the head and face of the body found. The skull was crushed and the face mutilated. A handkerchief was tied about one wrist, and a red mark on the other indicated where it had also been tied.

One witness positively identified the defendant as the negro who got in the car with Daniels at McAlester to make

the drive.    After the arrest of the defendant at Muskogee he made a confession to the officers, at first implicating two other negroes, which negroes were at once apprehended and questioned, and who were able to satisfy the officers that they were not connected with the crime.    Defendant was further questioned and implicated a third negro, but a little later stated that he himself killed Daniels, giving in details the circumstances.    He was then taken by automobile from Muskogee to McAlester, and on crossing the bridge on the Canadian river one of the officials in the party asked the bridgeman if he recognized the prisoner, and upon his saying that he did not, or something in substance to that effect, the defendant said in substance that he had bought a half gallon of oil from him on the night of July 23d.    The defendant was placed in the penitentiary for safe-keeping, and while there made another confession in the presence of the sheriff, county attorney, the warden, and some other persons, which statement was taken down in shorthand by the county court reporter and transcribed and introduced in evidence at the trial.    Prior to that statement the county attorney advised him fully that he was not required to make any statement and that any statement made would be used against him.

The confession made at the penitentiary was full, and gave in detail all the circumstances, and is that the defendant engaged Daniels to drive him to Crowder City, and on reaching there he engaged Daniels to carry him 3 miles further.    When they got to the Gaines creek bridge, where defendant was to leave the car, he got out and told Daniels another tire was down, and Daniels got out and looked at it, and he threw a gun on Daniels, tied his hands, went through his pockets, then hit him on the head with the crank of the car, and threw him in the water.    He then got in the car, and a short distance from there threw away the pocketbook of the deceased.    The evidence showed that on the 24th day of July he was in Muskogee in the Buick

car of Daniels, and on his arrest on July 27th the car was found there in a garage, where he had placed it. The watch belonging to Daniels was found in a pawnshop in Muskogee, where it had been pawned by the defendant on the 24th of July.

The defendant testified in his own behalf, and, briefly summarized, his testimony is to this effect: That at the instigation of a friend, one Mike Wordlow, colored, he borrowed a Ford car from Will Smith near the town of Haskell, and that he and Wordlow were going to McAlester to steal a car. That they drove down the Jefferson Highway, and near Eufaula, on account of a puncture, left the Ford and rode a freight train to Crowder, where defendant stopped, and Wordlow went to McAlester alone to steal the car. That on that night by agreement he was waiting at the crossing of the Jefferson Highway at Crowder when the deceased, Frank Daniels, and Wordlow came along driving north, and there he got into the back seat of the car. They drove north, had a puncture which was repaired, and drove to the Gaines creek bridge. The car stopped on the bridge, and Wordlow got out and said there was a puncture. Then Daniels got out and started to examine the tire, when Wordlow covered him with a gun and made him put up his hands and ordered defendant to go through Daniels' pockets, which he did, and then at the direction of Wordlow tied Daniels' hands with a handkerchief. He admitted owning the handkerchief taken from the wrist of the dead man. After tying Daniels, defendant testified he walked across the bridge, heard some conversation between Daniels and Wordlow and then a big splash in the water, and then Wordlow came across the bridge driving the car. He got in with him, and they drove to Eufaula, where defendant took the Ford and Wordlow the Buick into Muskogee. It was then daylight, and Wordlow then took the Ford and left, and the defendant retained the Buick. That early next morning they drove to Haskell, taking a negro woman

and some children with them, and spent most of the day. He further testified that when Wordlow turned the Buick car over to him there was a watch on the front seat which he pawned in his own name. His testimony was the confession at Muskogee was made only after the officers had assaulted and beaten him, and under duress and threat of death, and that the confession made in the penitentiary building at McAlester was under duress. That on the road to McAlester the officers had told him that he must make the same statement there as he made at Muskogee, and just before he made the statement at McAlester the sheriff privately warned him to tell the same story. The officers denied this in toto, and explained that the confession at Muskogee was in response to questions, and that no threats, intimidation, or violence of any kind was used on the defendant, and that when he made the first statement implicating others they immediately checked up his statement and brought in the negroes implicated to confront him, and that thereupon he changed his story. That at the penitentiary at McAlester the confession was voluntarily made, after being fully cautioned and warned that it would be used against him. There are other incidents corroborating and explanatory details in evidence.

In response to the first contention of counsel that sufficient time for preparation for trial was not granted, the defendant was arrested on the 27th of July. He was arraigned on August 1st, and counsel appointed for him, and he was given 24 hours in which to plead. On August 2d he pleaded not guilty, and the case was set for trial, and on August 21st he withdrew his plea of not guilty and filed a motion to quash, and then demurred to the information, and his plea of not guilty was again entered. A motion for continuance was filed and for a change of venue, and a motion to quash the jury panel was filed; all of which being overruled on August 25th, the case went to trial. Other motions were filed and overruled, and the case was tried.

On August 30th the jury returned a verdict finding him guilty and fixing the punishment at death.

Did this constitute such haste as would deny the defendant any substantial right or prejudice him in his defense? The towns of Muskogee and McAlester are some 60 miles apart, connected by railroad, a main highway, and, of course, telegraph, telephone, and mail routes. All the evidence directly bearing on the transaction was either at McAlester or Muskogee, between these points or near them, and defendant and his counsel had more than 3 weeks between the time of the plea at the beginning of the trial to make the necessary arrangements and preparations. The events at that time were fresh, and there would seem to be no reason why the defendant and his counsel would not be as well prepared in that length of time under the record in this case to present the defense as they would have been with longer time. No authorities are cited in support of this contention, and the contention is not tenable.

Upon the assignment that negroes were excluded from the jury panel for the sole reason that they were negroes, the record shows that the three jury commissioners were examined, and the evidence on this point is as follows:

Mr. Stallings:

"Q. What is your name? A. J. F. Stallings.

"Q. Are you one of the jury commissioners? A. I am.
* * *

"Q. Did you in selecting the names from the tax rolls —did you take them in order as they appeared on the tax rolls—take each name as it appeared? A. No, I would go through the list of names, selecting those I thought would make good jurors. * * *

"Q. Are there any negro taxpayers who are qualified electors in your district? A. There are some. Yes, sir.
* * *

"Q. Did you put any of their names in the jury box?

A.  Well, it did not occur to me.  I never saw one on the jury here. * * *

"Q.  What was the reason negroes were·left off the jury?  A.  I had no reason. * * *

"Q.  Did you excuse any citizen or taxpayer in this county from this panel simply because he was a negro?  A.  No, sir.

"Q.  Did you in any instance omit to put the name of negroes on this panel that you came across on the tax roll?  A.  I do not think I did.  I do not recall a negro's name."

Another jury commissioner was called and testified:

"Q.  What is your name?  A.  Richard Henley.

"Q.  Are you one of the jury commissioners of this county?  A.  Yes, sir. * * *

"Q.  In selecting this jury panel did you take every name as you came to it on the list of the county treasurer's books?  A.  I looked at every name I suppose as far as I know.

"Q.  Did you take every name that you looked at, or did you omit some?  A.  Yes, sir.  I omitted some.

"Q.  For what reason?  A.  Didn't know them, I suppose.

"Did you take every name that you knew?  A.  Until I got enough.

"Q.  In looking over the list did you see the names of any negroes?  A.  Yes, sir.

"Q.  Did you put any of them in the jury box?  A.  No.

"Q.  Why not?  A.  I supposed that they were not allowed to sit on the jury.  * * *

"Q.  Mr. Henley, you had no instructions to that effect from the court?  A.  No.

"Q.  You did not omit any names simply because he was a negro?  A.  No, sir.

"Q.  Was there any agreement between the members

of the commission not to put any name in the box because of their being a negro? A. No. * * *"

W. W. Williamson, another commissioner, being called testified:

"Q. You are one of the jury commissioners in Pittsburg county, Okla.? A. Yes, sir.

"Q. Did you exclude any person whatsoever from the list on the ground that he was a negro? A. No, sir.

"Q. Was there any agreement between the jury commissioners to exclude any person from serving on the jury upon the ground that he was a negro? A. No, sir. * * *

"Q. Did the commissioners, as a body, exclude any names that were negroes? A. No, sir.

"Q. As far as you know the members of the jury included any person of any race? A. Yes, sir."

H. I. Aston, court clerk, testified as follows:

"Q. Mr. Aston, during your incumbency to the office of court clerk of this county do you know whether negroes have been drawn upon the jury panel by the jury commissioners? A. Yes, sir. On several occasions.

"Q. Do you know whether members of the precinct commissions have drawn negroes? A. Yes, sir. On several occasions."

The record further shows that G. T. Hale, a colored man, was called on the jury and sworn as to his general qualifications and excused by the court. This juror, it appeared, was a scavenger working for the town of Krebs, and testified that he would just about lose his job if he was required to serve on the jury. It would appear proper at that season of the year to exclude a person engaged in that work, regardless of color.

Section 1 of the Fourteenth Amendment to the federal Constitution prohibits any state from making or enforcing any law that denies any person within its jurisdiction the

equal protection of the laws, and the exclusion of negroes otherwise qualified solely on account of their race and color is in violation of this provision of the Constitution. Smith v. State, 4 Okla. Cr. 328, 111 P. 960, 140 Am. St. Rep. 688, and authorities cited therein; McIntosh v. State, 8 Okla. Cr. 469, 128 P. 735, and authorities therein cited.

The question, however, of discrimination against negroes on account of race or color is a question of ·fact to be determined by the trial court. It is not determined by the mere fact that the jury for the trial of a negro· is composed solely of white men. The officers charged with the duty of selecting jurors may exercise their discretion in selecting those persons who in their judgment are competent and qualified. They are not required to select negroes, but they must not exclude them solely on account of their race and color. When it is claimed that they did so, and a negro charged with crime challenges the panel of the jury on that ground, the court should hear the evidence in support of the challenge, and, if it is of the opinion that as a matter of fact negroes were intentionally excluded from the panel solely on account of their race and color, the motion to quash should be sustained. In this case, on this point, the motion to quash is as follows: First. "Because no jurors of African descent or negroes were included among the jurors .of said panel, but were excluded therefrom for the sole reason that they are negroes." It was not verified. The court made no specific finding of fact, but overruled the objection on the ground set out, which is a general finding against the contention of defendant.

The statute fixing the qualifications of jurors (section 3523, Compiled Stats. 1921), among other things, provides that jurors shall have the qualifications of electors, and there is no evidence in the record showing the per cent. of negro population nor the per cent. of taxpayers among them nor the per cent. of qualified electors among the taxpayers. It is not shown that qualified persons were ex-

cluded from the list of jurors solely on the ground of their race and color.    The contention is not sustained by the showing made, and the court did not err in overruling the motion to quash.

It is then urged that the plaintiff in error should have been granted a change of venue from Pittsburg county.

An application verified by the affidavit of defendant was duly filed setting out the state of feeling in Pittsburg county; that there had been threats of mob violence; that large crowds were about the court at the time of the arraignment, and the feeling was tense; that the newspapers had given great publicity to the crime charged and to the alleged confession; and that it was unsafe to try the case in that county on account of the danger of mob violence. In response to this application the county attorney made an extensive counter-showing, in which was his own affidavit stating that he is largely acquainted with the people of that county, that the county contains an aggregate of 1,368 square miles, has a population of more than 50,000, and denying that there is considerable prejudice against the defendant in that county, and that, if any prejudice exists, it does not apply to persons subject to jury service, or, if so, to a very small per cent. of such.

In addition to the affidavits of the county attorney, 150 other affidavits from citizens scattered throughout Pittsburg county were filed, in which it is set out that in the opinion of those making the affidavits there does not exist in the minds of the inhabitants of Pittsburg county any bias or prejudice against the defendant that would prevent him from having a fair and impartial trial in that county; that a fair, impartial, and unprejudiced jury can be obtained.

The granting of a change of venue is by statute made discretionary with the trial court, and this court will not reverse a ruling of the trial court denying an application

for a change of venue, unless it appears that there was an abuse of discretion. The presumption is that a defendant can get a fair and impartial trial in the county in which the offense is charged to have been committed. The burden is upon a defendant to show his inability to obtain a fair and impartial trial. This has been so often stated by the court that it is not necessary to cite decisions announcing the rule, and under the record in this case there is no abuse of discretion shown.

The assignments above discussed cover the principal points raised in the brief. While some other objections are incidentally suggested, all have had the earnest attention of this court which the gravity of the case requires. The trial and procedure have been according to the law. No reason to disturb the verdict and judgment appears. A case in which the death penalty is assessed calls for the closest scrutiny. The record must be free from substantial error, and the evidence must make a clear and aggravated case of murder, otherwise this court will reverse or reduce the penalty to life imprisonment. The testimony and explanation of the defendant is but little short of a plea of guilty. The evidence on the part of the state shows a brutal and sordid slaying in a cruel manner.

It is but fair to say that the able counsel who have appeared for defendant in the lower court and in this court were appointed by the judge, but they have evidently given a great deal of effort in behalf of the defendant, and have left nothing undone to safeguard his rights.

The case is affirmed, and, the original time for the execution having passed, owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Pittsburg county be carried into execution on Friday, the 29th day of May, 1925. The warden of the penitentiary at Mc-

Alester is ordered and directed to cause the sentence to be executed according to law.

BESSEY, P. J., and DOYLE, J., concur.