CHARLES FILLMORE DAVIS v. STATE.

No. A-8340.   June 18, 1932.
(12 Pac. [2d] 555.)

412

Moman Pruiett and Wes Croy, for plaintiff in error.

J. Berry King, Atty. Gen., Gus Rinehart, Asst. Atty. Gen., and Ted R. Fisher, Co. Atty., for the State.

EDWARDS, J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Blaine county of murder, and his punishment fixed at death.

The information, in the usual form, charges murder in that defendant on June 25, 1931, did shoot and kill Guy Jarvis. At the time charged, Jarvis, a deputy sheriff, accompanied by another deputy, went to the residence of one Dobbins, a negro, at whose house defendant, also a negro, was at the time. Complaint had been made of the theft of some gasoline the night before, and the car in which the stolen gas apparently had been transported was tracked to this place. These officers stopped their car near the house. Jarvis went to the east door, the other deputy went to the north door; Jarvis knocked several times, and, no one answering, he put his head in the door and then immediately jumped back and ordered the defendant inside to lay down the gun. Defendant from within the house inquired who was there, and Jarvis informed him that he was an officer; that he wanted him for stealing gasoline, and again ordered him to lay the gun down and come out. Defendant parleyed with Jarvis and stated, in substance, he feared he would get shot if he came out; Jarvis assured him that he did not want to harm any one; advised him to lay down his gun and come out. Just then a car came along the road, and Jarvis stopped it and instructed the occupants to call the sheriff. The car left, and a wagon drove up in which was Mrs. Dobbins, who resided at this house. She got out of the car and went into the house at the east door, and about that time a shot was fired inside the house. The woman went on through the house and came out at the north door. One of the shots passed through the door of the house, struck the deputy on the north side, but did not injure

him. Defendant then said to Jarvis if he and the other deputy would lay down their guns he would lay down his gun and come out and give up. Jarvis agreed, laid down his gun, and called for the other deputy to lay down his gun. He did that, and both stepped away from the guns; then defendant came out of the east door with a shotgun pointed, took about two steps, and shot Jarvis, who fell, and then turned his gun toward the other deputy who left the scene. Defendant then picked up the gun of both Jarvis and the other deputy and made his escape. He was apprehended July 17, at Drumright. Later, while incarcerated in the jail of Oklahoma county, he made a signed statement substantially as set out. Excerpts from this statement are as follows:

"* * * Q. Getting back to the morning when Guy was killed. How long had you waited in the house before Jarvis and George Gender drove up there? A. As near as I can think it must have been about 10.00 o'clock, I guess. * * * I was laying down when they stopped. I did not hear them drive in but when they stopped the brakes kind of squeaked and I raised up and I got over on the other bed and the door was open and it made me behind the door. * * * I was sitting on the bed and he walked in. * * * He told me to come on out. Q. What did you do? A. He stepped back out the door. Q. You have the gun in your hand then? A. Yes, sir. Q. What did you do after he stepped out? A. When he stepped out I shot. * * * Q. You shot right after Jarvis backed out? A. Yes. Q. What did he say to you when he got out? A. He told me to come out. Q. You have your gun pointed at him at the time? A. When he stepped in I had the gun laying like this. Q. Pointing toward the door? A. Yes, when he got in I raised it like this. Q. Then you shot through the door? A. Yes. Q. Then what happened? A. He told me to come on out and I told him I was scared to come out, that he would shoot me. I said if you do not shoot I will. * * * Well

I stayed in the kitchen a long time and waited for Jarvis to change his position. I figured on giving up the deal and running out the kitchen door and running out in the pasture if he had moved from the north door. I figured he would go out in front but he stayed right there. Q. What did you do after you got in the kitchen? A. I stayed there a long time then went back in the other room. Q. Then where did you go? A. I just stayed in there. A fellow come down the road in a Chevrolet with his wife and three children. He asked him if he would go back down the road and call up Mr. Law. Then he come on back. Who did? A. Jarvis—in the yard and stayed there. * * * Q. After he told you to come out what did you do? A. I told him I would come out. * * * Q. You tell him he would have to do anything? A. He said he would not shoot me and so I said I will put my gun down if you put yours down, and he laid it down. And I decided I would not pull the job, I will go on and let them take me, and he says I will lay my gun down, come on out here, and he laid it down. * * * Q. How far from him? A. Just a little ways. * * * Q. You pick your gun off the bed? A. Yes, I picked it up again. Q. He see you pick it up? A. No, sir. * * * Q. How far did you step outside the door? A. I guess about as far as this table. * * * Q. You just stepped out and then what did you do? You have your gun in your hand? A. Yes. Q. What did you say? A. This other fellow Gender he was standing out by his car and he throwed his gun back toward me and went down the road. Q. Gender throwed his gun toward you before you shot? A. Yes. * * * A. After Gender throwed his gun down he went down the road. I started to run but I could see he had a gun or I could see what I thought was the print of a gun on his bosom, and I figured if I run he would shoot me anyway. Q. Was Jarvis looking at you when you shot him? A. Yes, sir. Q. Have his gun then? A. I could see what I thought was a print of a gun on his bosom, I started to run, thought I wouldn't pull the deal but I thought he would shoot me anyway. * * * Q. His gun was laying on the ground? A. Yes, right by him. * * *

Q. When you shot Jarvis, he was standing there looking at you? A. Yes, sir. * * *"

Defendant did not testify at the trial, and offered no testimony except one witness as to a matter of record.

Defendant was arraigned on July 27, entered a plea of not guilty, and, at the request of his counsel, trial was set for September 21. On that date his counsel moved to quash the jury panel, alleging that the jury commissioners had excluded negroes because of their race. The motion is general in its terms, and must be construed liberally indeed to raise the constitutional question sought. This challenge presented a question of fact, and, though offered an opportunity to present evidence in support, no testimony was offered. The motion was properly overruled. McIntosh v. State, 8 Okla. Cr. 469, 128 Pac. 735; Scott v. State, 29 Okla. Cr. 324, 233 Pac. 776.

Following the overruling of the motion to quash, an application for change of venue was filed stating in general terms that: On account of the bias and prejudice of the citizens against him, defendant could not have a fair trial in Blaine county; that counsel had endeavored to procure affidavits in support of this application, but had been unable to do so; that they had talked to many citizens of the county who stated, in substance, that defendant could not have a fair trial, but they would not make an affidavit to that effect. No witnesses in support of this application were called. As a counter-showing, the state offered a large number of affidavits from eighteen different localities in Blaine county, setting out the belief of affiants that defendant could have a fair and impartial trial in that county, and that they knew of no prejudice against him in their respective communities. In the matter of a change of venue, the burden is on a defendant. The grant-

ing or refusal of an application for change of venue is discretionary with the trial court, and, unless there is an abuse of discretion, this court will not reverse the ruling of the trial court denying a change of venue.

It is argued the court erred in overruling the challenge for cause interposed against two jurors who sat in the case, but the record discloses that defendant did not exhaust all of his peremptory challenges. He cannot complain of a juror whom he might have excluded by peremptory challenge. Tudor v. State, 14 Okla. Cr. 67, 167 Pac. 341.

Defendant alleges misconduct of the jury during the trial in separating in the lobby of the hotel and talking to persons there. Upon this point it appears, before the case was finally submitted to the jury, defendant's counsel did talk to one of the jurors in the lobby of the hotel, but not on any subject connected with the trial. The others were standing about at the time. Before a case is finally submitted to the jury they may separate, and, if any misconduct is alleged as a result of such separation, the burden is on defendant to show it. While in the instant case the jury were not permitted to separate, yet, the alleged misconduct having occurred before the case was finally submitted, the burden is on him to show prejudice. This contention is without merit. Nowabbi v. State, 36 Okla. Cr. 97, 252 Pac. 442; Womble v. State. 50 Okla. Cr. 108, 296 Pac. 515.

It is also argued that the evidence does not sustain the judgment for the reason that at the time the deceased and his companion went to the Dobbins home, where defendant was to arrest him, they had no warrant, and that the offense for which they sought to arrest him was a misdemeanor not committed in the presence of the officer,

and that the attempted arrest was illegal and defendant had a right to resist. This is the most serious contention presented. A peace officer may arrest without a warrant for a misdemeanor only when the misdemeanor is committed or attempted in his presence. Section 2471, Comp. Stat. 1921. A peace officer is a trespasser when he attempts to arrest without a warrant for a misdemeanor not committed or attempted in his presence, and the person sought to be arrested may resist arrest. Roberson v. U. S., 4 Okla. Cr. 336, 111 Pac. 984; Collegenia v. State, 9 Okla. Cr. 425, 132 Pac. 375; State v. Anselmo, 46 Utah, 137, 148 Pac. 1071; Sunday v. State, 14 Okla. Cr. 620, 174 Pac. 1095. See, also, Love v. State, 15 Okla. Cr. 429, 177 Pac. 387; Ballard v. State, 16 Okla. Cr. 263, 182 Pac. 524; Robsion v. State, 53 Okla. Cr. 178, 9 Pac. (2d) 54.

The right to resist an unlawful arrest is limited and varies with the circumstances. If the official character of the officer is known to the person sought to be arrested, or if the officer informs him of his official character and his reason for the arrest, and the person sought to be arrested has no reason to apprehend any treatment other than detention, he is not justified in the use of a deadly weapon in resisting the arrest.

The statutes of the different states vary, but in substance there is a general uniformity. The general rule is stated in 29 C. J. 1093, § 68, thus:

"One who in resisting a lawful arrest intentionally kills a person seeking to arrest him is guilty of murder. * * * Even when an attempt to arrest is illegal, the killing of the officer with malice is murder. * * *"

To much the same effect is 2 R. C. L. p. 474, § 32. The law places too high a regard upon human life to justify the slaying of a human being in resisting a mere trespass,

and the deliberate killing of another to prevent an illegal arrest is murder. Williams v. State, 44 Ala. 41; Rafferty v. People, 72 Ill. 37; Anderson v. State, 133 Wis. 601, 114 N. W. 112; Roberson v. State, 43 Fla. 156, 29 So. 535, 52 L. R. A. 751; Muscoe v. Com., 86 Va. 443, 10 S. E. 534.

The undisputed facts in the instant case disclose that the killing was deliberate and malicious. Upon the appearance of the officer, and before he had uttered a word, defendant menaced him with a gun. The officer then informed defendant of his official character and the purpose for which he sought to arrest him and asked that he submit. This demand that defendant submit to arrest was illegal; yet defendant agreed that if the officer would lay down his gun he would submit to arrest. The officer readily agreed. He and his companion put their guns out of reach, disclosing that they had no purpose other than to arrest him for a misdemeanor. Defendant then deliberately shot and killed the officer who was standing unarmed before him. He was moved by no sudden passion. The officer had not laid hands upon him, and he was threatened by no violence. Under the law, such a killing is premeditated and malicious. We see no mitigation to reduce the degree of homicide.

The case is affirmed.

The original time for the execution having passed, owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Blaine county be carried out by the electrocution of the defendant on Friday, August 19, 1932.

DAVENPORT, P. J., and CHAPPELL, J., concur.