GEORGE NORTON et al. v. STATE.

No. A-8529.   Dec. 21, 1934.
(39 Pac. [2d] 162.)

T. J. Hinshaw, and Jack W. Page, for plaintiffs in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

CHAPPELL, J.   The plaintiffs in error, George Norton and Jim Norton, were convicted in the district court of Cleveland county of the crime of murder in the killing of Pat Urkheart, and the punishment of each fixed by the jury at imprisonment in the state penitentiary for life.

The evidence of the state was that Jim Norton, who was about 56 years of age, was the father of George Norton, who was 17 years of age; that the Nortons lived in a house upon some premises which deceased claimed to have rented; that defendants at about 6 o'clock in the evening had gone to the home of one B. Scott nearby and borrowed a No. 10 gauge shotgun, as they said, to kill rabbits with; that as they reached their home deceased called to George Norton and wanted to talk to him; that

the Nortons went on in the house, and as deceased approached the porch George Norton fired the gun, a load of shot striking deceased about three inches below the right nipple; that Jim Norton was in the room with George when the shot was fired; that deceased immediately fled from the scene and fell a short distance from the house and died in a few minutes, after making a statement that George Norton had shot him; that the Nortons were arrested about midnight and taken to the county jail; that the officers found the gun at the home of George Norton's cousin; that the next day George Norton told the officers he traded for the gun about two years ago, in the eastern part of the state, and kept it about the house to shoot rabbits with; that he always loaded the gun in the evening and set it by the wash stand, and that he did so on that evening; that later in the day Jim Norton told the officers they had had the gun about three months, but when the officers told him they knew who owned the gun and where they got it, he admitted they borrowed it from Scott and said they were expecting trouble with Urkheart and got the gun and aimed to use it on him if he tried to put them off the place; that later in the day George Norton made the same admissions and practically the same statements.

Defendants testifying for themselves said that deceased approached the house cursing and threatening to kill them; that he pulled a pistol from his hip pocket and threatened to shoot them; and that George fired the fatal shot in self-defense.

In rebuttal the state showed by the officers that no pistol was found on deceased nor about the premises; that the coveralls deceased wore had no hip pockets; that the ground where deceased stood was about fourteen inches lower than the porch; that deceased was not on the porch

 

but out in the yard; and that the shots which killed him ranged downward, showing that the one who did the killing had stood much higher than deceased.

In the oral argument in this court, counsel for George Norton admitted the evidence was sufficient to sustain the verdict of the jury as to him, but contended in the argument, and now contend in their brief, that it was wholly insufficient to sustain a conviction as against Jim Norton.

The existence of a conspiracy in any particular case is an inference to be drawn by the jury from all the facts and circumstances in evidence. The state may either prove the conspiracy which renders the acts of the conspirators admissible evidence, or it may prove the acts of the defendants, and thus prove conspiracy. From evidence proving that two or more persons aided by their acts toward the accomplishment of the same unlawful object, each doing a part, so that their acts, though apparently independent, were in fact connected and co-operative, indicating a closeness of personal association and a concurrence of sentiment, a conspiracy may be inferred, though no actual meeting among them to concert means is proved. The details of a conspiracy need not be proved.

When in a criminal case the inference of guilt can be reasonably drawn from the evidence, this court will not interfere with the verdict on the ground of want of evidence to sustain it. There is a direct conflict in the testimony for the state and that for the defense. Upon the testimony of appellants and their witnesses the jury could have acquitted them. On the other hand, the testimony on the part of the state if credited, as it was, was amply sufficient to sustain the conviction. It appears from all the evidence in the case that defendants were act-

ing in concert and with a common purpose and intent in the commission of the offense charged.

It is next contended the trial court erred in overruling the challenge for cause of the prospective juror Rushing.

The entire examination of the juror on his voir dire does not appear in the case-made, but enough of the examination does appear to show that the juror had never talked with any witness in the case nor with any person who pretended to know any of the facts surrounding the killing. He had some impression as to the guilt or innocence of the defendants from reading newspaper reports, but said he had no opinion at that time as to what should be done in the case, and that the opinion he had from reading the newspapers would yield to evidence.

The action of the trial court on a question of this kind is largely one of discretion, and there must appear a manifest abuse of such discretion before the court will set aside a verdict, even if it were shown that the juror sat in the trial of the case, which does not appear in this instance. This rule is supported by: Turner v. State, 4 Okla. Cr. 164, 111 Pac. 988; Gentry v. State, 11 Okla. Cr. 355, 146 Pac. 719; Agent v. State, 18 Okla. Cr. 282, 194 Pac. 233; Harper v. State, 20 Okla. Cr. 43, 200 Pac. 879; Littrell v. State, 21 Okla. Cr. 467, 208 Pac. 1048.

There is another reason why there is no merit in this contention. There is nothing in this record to show that by the overruling of this challenge defendants failed to get a fair and impartial jury. If they did get a fair and impartial jury, that was all they were entitled to, as they had no vested right to have any particular juror sit in the trial of the case until after the jury had been sworn. Coatney v. State, 52 Okla. Cr. 70, 2 Pac. (2d) 604.

There is still another reason why there is no merit in this contention. The record does not show that defendants exercised all of their peremptory challenges.

In Davis v. State, 53 Okla. Cr. 411, 12 Pac. (2d) 555, this court said:

"Even though the trial court may improperly overrule a challenge for cause and the challenged juror permitted to sit on the panel, if it appears that defendant did not exhaust all of his peremptory challenges the error is waived."

So, viewed from any angle, there is no merit in defendants' contention.

No sufficient reason for reversal appearing, the cause is affirmed as to each of the defendants.

EDWARDS, P. J., concurs.

DAVENPORT, J. (dissenting). After having carefully read and studied the record in this case, I cannot give my approval and concur in the opinion of the majority of the court, for the reason that I do not believe the evidence and the law are sufficient to sustain the conviction as here presented.

The following is a brief abstract of the testimony as presented to the court and jury: The deceased, Pat Urkheart, lived in the neighborhood where the defendant Jim Norton, his wife, and son were living; Urkheart claimed to have gotten control of the house in which the Nortons were living; George Norton, at the time of the difficulty, was 17 years of age, the son of Jim Norton. Prior to the date of the trouble the deceased and George Norton had some trouble about some work, and the deceased had demanded that the Nortons move from the house in which they were living. The deceased told George Norton if

the Nortons did not move he would put them out. The defendant had performed considerable work for deceased in order to be permitted to occupy the house; just prior to the date of the trouble, at a hay baler, in the presence of a number of witnesses, the deceased demanded that George Norton work for him at the hay baler and George refused. In the controversy, he threatened to stomp young Norton and advised him that the Norton family must get out of the house, and the boy told him to talk with his father. When, George Norton requested the deceased to talk with his father about moving from the place, the deceased replied in substance that he had always talked with George. It is clear from the record that the deceased did not desire to discuss the question of the Norton family moving with the father, but selected the boy to make his demands to move and threats as to what he would do if the family did not move.

It is further disclosed by the evidence of the defendant George Norton that on Saturday, prior to the date of the trouble on the 9th of August, 1933, deceased came to the home of the Nortons, and George says the deceased advised us he was going to visit his mother and that he had better be out by the time he came back; that if we did not move he would move us then without going to law. Deceased displayed a pistol and said: "This is what I will move you with without going to law."

The record further shows that on the date of the killing, some time in the afternoon, the defendant George Norton and his father, Jim Norton, went to the home of B. Scott, and George borrowed a shotgun to go rabbit hunting; the defendants left the Scott home some time in the afternoon and hunted rabbits for some time and started home; as they neared their home they saw the deceased, Pat Urkheart; he called to the defendant George Norton

and asked him to come over to where he was; George refused to go; both defendants went on to their home and went into the house; when the defendant George Norton refused to go to the deceased and went on to the house, the defendant George Norton says the deceased followed them, cursing and abusing him, and threatened to do some kind of violence to the family; he requested the deceased to go away and he refused to do so, and came up to the edge of the porch and started to step upon the porch; at the time the deceased had a pistol in his hand; as the deceased was stepping upon or near the porch, the defendant George Norton fired the fatal shot.

The evidence shows that at the time the shot was fired the father, Jim Norton, was in the house and did not know what his son George intended to do. He had not consulted with him and had not advised him to use any violence toward the deceased. George testified he was afraid of the deceased; that deceased had abused him on one or more occasions, and was coming upon the porch, or had just stepped upon the porch, and threatened to kill the whole family. The testimony clearly shows that the defendants in this case were very poor people who had been working from place to place for the neighbors for any price they could get, sometimes working as cheap as 25 cents per day; that the deceased claimed to have control of the premises and became very angry at the defendant George Norton because he would not help do his work for nothing.

The deceased seemed to be angry because the Nortons would not continue to work for him at his will, or move when he decided they must move. The testimony shows that defendants were very poor, having no property and working by the day to earn a living for themselves and the mother of George Norton; they were in possession

of the premises, and while occupying said premises were entitled to protect themselves against the deceased doing them bodily harm.

R. A. See, a witness for the state, who was the father-in-law of deceased, testified he was at the home of deceased and could see the home of the defendants, which was more than one hundred yards away; he heard a shot and looked toward the Norton home and saw the deceased throw up his hand and turn and leave the Norton home; at the time he saw the deceased, after he heard the shot, it looked like deceased was a short distance from the porch; when the deceased got near his home, Mr. See says he talked to him and deceased said: "George did it, I know who did it."

The testimony further shows that when the defendants surrendered near the Ellis home they advised Mr. Ellis what had happened; they stated George had shot Mr. Urkheart. All of the testimony clearly shows the shot was fired by George Norton. The theory of the state seems to be that the defendants, Jim and George Norton, had entered into a conspiracy to take the life of the deceased. The only facts shown by the record against Jim Norton are that he was with his son, George, when he borrowed the gun from Mr. Scott; that he was with him when the trouble occurred between George and the deceased. Jim Norton says that when Mr. Urkheart commenced talking and abusing them that he went into the house and did not know what George was going to do, and had not advised him to do the deceased any harm; that he went in the house to keep from having any trouble with the deceased, Urkheart, and when he heard the gun fire he looked and saw Mr. Urkheart on the porch, or near it. The record further discloses that the state, through its officers, had the defendants separated and brought before

the county attorney and sheriff for the purpose of trying to secure a confession from the defendants. One of the deputies, Ivan Kennedy, after admitting they had the defendant Jim Norton brought out of the jail to try to get him to give his version of the trouble, stated that Jim Norton told them the gun was borrowed because the defendants expected trouble with Urkheart. The defendants were in custody at the time, and the record fails to show they were advised by either the sheriff or county attorey that any statement they made might be used against them.

All of the circumstances and statements made by either of the defendants from the time of the shooting up to the time of the trial clearly contradict and show that the statements testified to by Kennedy are false and untrue. The defendants were entitled to a fair and impartial trial and should have been advised of their rights, and it was improper and unfair to the defendants, or either of them, to take them from the jail to the private office and there try to force from the defendants statements with reference to the difficulty, and to try to contradict the statements previously made by the defendants. Jim Norton, one of the defendants, emphatically denies that he made the statement testified to by the witness Kennedy. George Norton testified he borrowed the gun for the purpose of hunting rabbits; that he had not consulted his father regarding the Urkheart matter, and corroborated his father on the question of there being a pistol in their home at the time of the trouble.

Keeping in mind the fact that George Norton was a boy 17 years of age, and Jim Norton was his father, the state has failed to prove sufficient facts to show a conspiracy. Considering the youth of George Norton, it does not stand to reason that if a conspiracy had been entered into between the defendants to do harm to the deceased

that the father would have trusted George to use the gun, but would have used it himself.

The defendants assign several errors alleged to have been committed by the trial court. First, the defendants alleged that the court erred in overruling their motion for a new trial. This assignment will be considered in connection with the sixth assignment, as to the defendant Jim Norton. The sixth assignment being:

"The court erred in overruling the motion of the defendant Jim Norton for a directed verdict of not guilty, made at the close of all the evidence."

The defendant Jim Norton urges that the evidence is wholly insufficient to justify the jury in returning a verdict against him, and that the evidence wholly fails to connect him in any manner whatsoever with the killing. The theory of the state seems to be that a conspiracy existed between the said George Norton and Jim Norton to take the life of the deceased, as it is not disputed that George is the one that fired the shot, and George in his evidence details at length the circumstances at the time the shot was fired, and what had taken place.

Section 1808, Okla. Statutes 1931, is as follows:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

To constitute one a party to the crime under section 1808, it is necessary that such person be concerned in the commission of the offense; that is, that he either commit the act, or aid or abet in its commission. It is not sufficient that the party merely acquiesced therein. Consenting and acquiescing are mere mental acts, which unless

communicated to the perpetrator of the offense in no manner aid or abet him in its perpetration.

I think the testimony fails to show or connect the defendant Jim Norton with any act concerned in the commission of the crime or that he procured it to be done, or aided, assisted, abetted, advised, or encouraged its commission. Nor is there any testimony showing he took any part in the commission of the crime, gave counsel, or entered any word of encouragement to the defendant George Norton, who killed the deceased. The testimony clearly shows that the defendant Jim Norton did not know what the defendant George Norton was doing or going to do.

A careful examination of the evidence in this case convinces the court that the same is wholly insufficient to sustain the conviction of Jim Norton, and that it would be a miscarriage of justice to permit this conviction to stand, in view of the fact there is no competent evidence of an incriminating nature sufficient to sustain the judgment. Moore et al. v. State, 4 Okla. Cr. 212, 111 Pac. 822; Thompson v. State, 14 Okla. Cr. 209, 116 Pac. 1125; Carrico v. State, 16 Okla. Cr. 119, 180 Pac. 870.

The next question to be considered by the court is the question, urged by the defendant George Norton, that his motion for a directed verdict of not guilty should have been sustained. The killing being admitted by George Norton, the question is: Was it justifiable? George Norton insists he fired in his necessary self-defense to prevent the deceased from doing him or his parents great bodily harm. It is disclosed by the testimony that George Norton, a boy of 17 years of age, was living with his father and mother in a house near the residence of the deceased; that deceased claimed to have the renting and control of the house in which the Nortons lived. It is further shown

that the Nortons recognized the right of the deceased and had been working for the deceased for a nominal sum, and working in the country for different parties for any price they could get, often as low as 25 cents per day.

It is further disclosed that the deceased demanded of George Norton that they leave the premises, and just prior to the date of the trouble, at a hay baler where other parties were present, demanded that George Norton work for him at the hay baler, and George refused. In the controversy he threatened to stomp George and advised him that the Norton family must get out of the house, and George told the deceased to talk to his father. The deceased in substance replied: "I have always talked with you." It is clearly shown that the deceased had no desire to discuss the question of the Norton family moving with the father, but preferred to talk to this 17 year old boy, George.

It is further shown that on Saturday, prior to the date of the trouble the 9th of August, 1932, deceased came to the home of the Nortons and told George he was going to visit his mother, and that the Norton family had better be out of the house by the time he came back; that if they did not move he would get them out without going to law, and George said he displayed a pistol, saying: "This is what I will move you with without going to law."

It is further shown the only controversy between the defendant George Norton and the deceased, prior to the day of the killing, was when the deceased abused George and threatened to stomp him, and threatened vengeance against the Norton family because George refused to work for the deceased at the hay baler. A great deal of enmity had been aroused between George Norton and the deceased. The boy was young and expected trouble with deceased

every time they met. In the evening, and a few hours prior to the killing, George Norton went to Mr. A. Scott's home and borrowed a shotgun. George says he borrowed the gun for the purpose of hunting rabbits, and that he was accompanied by his father, and they did hunt rabbits for some time before returning home. He denies he borrowed the gun for the purpose of doing an injury to the deceased.

The testimony shows when the defendant George Norton and his father got near their home they saw the deceased under a shade tree; when they got near the house the deceased called to George and asked him to come to him; George refused to do so and went on toward the house, and deceased advanced toward the house; just what took place at the time and before the shot was fired no one but George Norton knows. George says deceased was abusing and cursing his family, and threatening to do them harm, and that deceased advanced to the porch and started to step on the porch, or had stepped on the porch, and that deceased at that time had a pistol in his hand, and he fired the shot that took the life of the deceased as he was afraid of him and believed he intended to do them great bodily harm or take the life of himself and his family.

R. A. See, father-in-law of the deceased, Pat Urkheart, stated he was at the home of the deceased; he heard a shot and looked toward the Norton home, which was about one hundred yards from where he was, and saw the deceased Pat Urkheart throw up his hand and turn and run towards his home; the deceased fell near his mail box, and when the witness spoke to deceased he said: "I know who shot me, George did it."

The defendant George Norton testified that at the time he shot the deceased the deceased had taken a pistol

from his pocket and was holding it in his hand. To contradict the statement of the defendant George Norton, the state called a witness to show that at the time of the difficulty the deceased was wearing a pair of overalls, and that the overalls worn by the deceased did not have a hip pocket. The defendant George Norton in his testimony states positively that his father knew nothing about what took place between him and the deceased just prior to the time he shot the deceased; that prior to the time of their returning to their home the defendant Jim Norton had not advised or encouraged him in doing any violence to the deceased; that he did not have any conversation with his father after they returned home prior to the time of the fatal difficulty; that he was afraid of the deceased, and believed at the time the deceased came to the porch he intended to carry out the threats he had made; and that he fired the shot to protect the life of himself or family, or to keep them from receiving great bodily harm at the hands of the deceased.

Under all the testimony presented the case was submitted to the jury, under the instructions of the court, and a verdict of murder imposing a life sentence was returned. It is urged by the defendant George Norton that the testimony is insufficient to sustain a conviction of murder. The question as to whether or not the testimony is sufficient to sustain a conviction of murder is the only question presented by the defendant George Norton that the court deems necessary to consider.

Section 2216, Okla. Stats. 1931, defines "murder" as follows:

"First. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.

"Second. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"Third. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

Section 2223, Okla. Stats. 1931, defines "manslaughter in the first degree":

"First. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"Second. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

"Third. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

The theory of the state is that there was a conspiracy between the defendants, George and Jim Norton, to take the life of Pat Urkheart, and that in carrying out that conspiracy George, this boy of 17 years, shot deceased. After reviewing the circumstances and carefully considering all the competent testimony in the record, I cannot agree with the contention of the state. The fact that George Norton borrowed the gun and carried it home is not sufficient to establish the intention on his part to take the life of the deceased. He had a right to borrow the gun and to carry it. When he shot the deceased he was at his home where he had a right to be. It is clear from the testimony that the defendants, Jim and George Norton, did not seek a difficulty with the deceased but tried to avoid the same.

The defendant George Norton on his return to their home, when called to by the deceased who was near the Norton home at the time to come to him, refused to go to the deceased but went on in the house. The deceased advanced toward the house and reached the porch or stepped upon the porch. What was said or done by the deceased just prior to the firing of the shot no one but George Norton knows. After the shooting the only statement made by the deceased was that George shot him.

I do not believe the testimony sufficient to show that the killing in this case was in furtherance of a conspiracy entered into between the defendants. After a careful reading and study of the record, I hold that the record fails to state sufficient facts to bring, the killing in this case within the definition of "murder" as provided by section 2216, Okla. Stats. 1931, and that the verdict of murder is not sustained by sufficient evidence.

The next question to be considered by the court is: Is the evidence sufficient to sustain a conviction of "manslaughter in the first degree" as defined by section 2223, Okla. Stats. 1931? The evidence shows that the killing was done in a heat of passion by means of a dangerous weapon, and not done under such circumstances as to constitute excusable or justifiable homicide. Manslaughter in the first degree is an included offense within the crime of murder. Section 2820, C. O. S. 1921, now section 3204, Okla. Stats. 1931, in part provides:

"The appellate court may reverse, affirm or modify the judgment appealed from, and may, if necessary or proper, order a new trial."

This court in construing the facts in Lebo v. State, 40 Okla. Cr. 116, 267 Pac. 288, held that under section 2820, C. O. S. 1921, now section 3204, supra, it had the

power to modify the judgment of an assault with intent to commit rape to assault and battery, assault and battery being an included offense within the crime of an assault with intent to commit rape. See Mayberry v. State, 44 Okla. Cr. 134, 279 Pac. 934.

Considering all the facts and circumstances in the record, I do not believe the defendant George Norton is guilty of any higher crime than manslaughter in the first degree. He was accorded a fair and impartial trial; and I believe the judgment as to George Norton should be modified from murder to manslaughter in the first degree, and his punishment reduced from life imprisonment to a term of 25 years, and that his conviction as modified to manslaughter in the first degree, and the punishment to a term of 25 years, should be affirmed.

In my opinion there is no competent evidence to sustain the conviction against Jim Norton, and I believe the judgment as to Jim Norton should be reversed, with directions that the case be dismissed as to him.