# R. B. PERKINS et al. v. STATE.

No. A-5269.   Opinion Filed Nov. 16, 1926.
(250 Pac. 544.)

L. A. Pelley, P. K. Morrill, and Lydick, McPherren & Wilson, for plaintiffs in error.

Geo. F. Short, Atty. Gen., Smith C. Matson and Leon Hirsh, Asst. Attys. Gen., and Guy P. Horton, for the State.

BESSEY, P. J. The plaintiffs in error, R. B. Perkins and D. J. Tays, in this opinion designated the defendants, were on April 1, 1924, convicted of the crime of riot, with the punishment of each fixed by jury at confinement in the penitentiary for the term of two years. From the judgment on the verdict, they appeal.

This prosecution involves the Knights of the Ku Klux Klan, knight errantry, and mingled romance, comedy, and tragedy.

In stating the facts, many of the incidents are purposely omitted. A recital of facts, sufficient to illustrate the legal points involved, follow:

The prosecuting witness, Robert Kimbell, and Inez Earls testified that Kimbell, on the night of the whipping, made a prearranged social call on Miss Earls at her home in Altus. Upon his arrival there about 8 o'clock p. m., he found her friend, Mrs. Pendleton, visiting there. Presently a drive was suggested, to which the three assented, and together they got into Kimbell's Ford coupe, with Miss Earls at the wheel. After driving a circuitous route in the country, and when they were approaching Altus, about three miles distant, at between 10 or 10:30 o'clock, they came upon a group of 12 or 15 men in the public highway, clad in hooded, white robes—the regalia of the Ku Klux Klan. One or more of the number ordered the driver to stop. The young lady, at the suggestion of Kimbell, did not heed their order, and, as they passed, one of the group fired a shot. In her excitement or in order to avoid striking one or more of them, the young

lady caused the car to swerve so that it ran into a boggy ditch, where she could move no farther. To investigate and disclose his identity Kimbell got out of the car, addressed the group generally, and demanded to know what they wanted. Some one or more of the number made some insulting remarks about his being out riding with a married woman; others scrutinized the car and its occupants with searchlights. Kimbell became angry and defied the mob, and, as the argument progressed, several members of the party violently punched Kimbell's stomach and bowels with their guns with such violence that the marks of these assaults remained upon his body for days. Finally, these men in masks and regalia decided to send Kimbell and his companions on their way, and proposed pulling the car out of the ditch. Kimbell protested and stated that he would accept no assistance from any of the party, and at the same time he locked the steering wheel and threw the key away into the darkness. Two or more of the hooded party then seized Kimbell and threw him upon the ground, face downward, and unmercifully applied the lash to his back—20 or 30 stripes, the bloody marks and lacerations of which remained on his body for many days. After the whipping, Kimbell and his companions were forced to enter one of the automobiles there—an old four-cylinder Buick car. The two women sat in the front seat with the robed and hooded driver; Kimbell sat in the rear seat with another. Thus they proceeded on towards Altus. When they reached a point a little over a mile from town, Kimbell and his women companions were ordered to get out of the car. After alighting, the car with the two abductors drove away. From there Kimbell and his companions walked into Altus, where they separated, and each went to their respective homes.

It was shown by the state, and the defendants

admitted, that defendant Perkins was the cyclops of the Altus chapter of the Klan, and that Perkins was a large man weighing about 210 pounds, with peculiar mannerisms, among which was an effeminate voice. The prosecuting witness says he learned to know this vocal peculiarity well by hearing defendant Perkins talk when he was a member of the church building committee in Altus. It was shown that the regalia worn by the cyclops differed from that of ordinary knights, in that it was lined with red silk and the hood bore the number of the local chapter. By these and other means, Kimbell and his companions positively identified Perkins as one of the leaders of the mob, as one of the men who participated in the whipping, and as the one who sat with Kimbell in the rear seat of the Buick as they rode towards town. It was shown, moreover, that the cyclops was the custodian of the one and only key to the locker containing the robes, hoods, and other regalia of the order, and that no part of this regalia could be removed without the knowledge or assent of the cyclops.

Defendant Tays was identified in this manner: After the whipping, and while Kimbell and his companions were being driven towards Altus in this Buick car, and while Kimbell was sitting in the rear seat with the cyclops, Kimbell, for the purpose of afterwards identifying the car, surreptitiously took from his pocket a small knife with which he cut two small circular places in the side-rear curtain, next to where he sat. Miss Earls, who sat in the front seat, noticed that the car was an old four-cylinder Buick, similar to one that she herself had driven, and like the one owned and operated by defendant Tays. After being ejected from the car and as she and the prosecuting witness and Mrs. Pendleton were walking towards town, they all agreed that the man who sat in the rear seat with

Kimbell was Perkins, the cyclops. Miss Earls believed that the man who drove the Buick car was Tays, but did not communicate her knowledge or suspicions to Kimbell because she feared that Kimbell, in the angry mood in which he was, might do him some personal violence or perhaps kill him.

After Kimbell had sufficiently recovered to go about, he went, in company with his brother, from place to place in Altus, to find the car with the peculiar marks he had made in the side-rear curtains. Finally, they discovered this car with the curtain so marked parked near a place where a building was being constructed, where defendant Tays, who was a carpenter, was assisting in its construction. Kimbell and his brother lingered about some distance away, until Tay's wife came and got into the car and drove it to their home. Some time later, when they sought to further identify this car, it was found that the curtain had been removed and its whereabouts could not thereafter be ascertained. It was shown and admitted that Tays habitually drove the four-cylinder Buick driven by his wife, and that he was a member of the Altus chapter of the Ku Klux Klan.

At the trial, the defense of both defendants was an alibi, both more or less imperfect, except that Tay's wife testified that he was at home on the night of the whipping, all night long.

The assignment of error may be summarized thus: (1) That the court erred in admitting incompetent and prejudicial testimony in evidence over their objections; (2) that the trial court erred in giving instructions Nos. 3-A and 4; (3) that the judgment of the court is not supported by sufficient evidence; (4) that certain of the jurors were corruptly influenced, so that the defendants were not accorded a fair trial.

Touching the alleged incompetency of evidence of which complaint is made, the state, on cross-examination of defendant Perkins, sought to show that he and other members of the Klan had committed like depredations upon others, presumably for the purpose of showing a general conspiracy, tending to elucidate the similarity of the plans and methods used in committing such outrages and the identity of the persons who committed them. For that purpose, defendant Perkins, on cross-examination, was asked:

"Didn't you visit him (Robert White) in the regalia of the Ku Klux Klan, and ask him (Robert White) about some trouble with his wife, and tell him if he didn't straighten up that you would get him, or words to that effect?"

To this question the defendant answered, "I did not." Later, Robert White was called in rebuttal and, among other things, asked this question:

"I will ask you if, approximately a month before that happened, Mr. Perkins, the defendant in this case, came to you in the regalia of the Ku Klux Klan and asked you something about some trouble with your wife, and then told you if you did not straighten up that they would attend to you; that they were the law, or words to that effect?"

To this question an objection was interposed and sustained by the court. Despite the sustaining of the objection, the witness answered the question, "Yes, sir." No request was made to withdraw the answer or to charge the jury not to consider it. Indeed, the record is not clear whether the jury heard the answer or not. On this feature of the record the defendants have no cause for complaining. If the defendants felt aggrieved at the answer, they should have requested its exclusion. Brown v. State, 17 Okla. Cr. 394, 188 P. 1097.

From what appears elsewhere in the record, we

are inclined to believe that the question was competent and relevant, involving a proper subject for the consideration of the jury. It must be remembered that the defendant's defense was an alibi, and the state should be permitted to show, if they could, that this and the other defendant were identified with an organization, the members of which used the same regalia, the same system and methods in reprimanding and punishing others who were suspected of violating the moral or statutory code.

Underhill on Criminal Evidence (3d Ed. § 125), states this principle thus:

"Where a crime has been committed by some peculiar, extraordinary, and novel means or implement or apparatus, or any peculiar or extraordinary manner, evidence of a similar crime committed by the accused, by the same means or in the same manner, has been received to prove the identity of the accused, as an inference from the similarity of method. Where the offense is committed pursuant to system or peculiar method, for the purpose of establishing the identity of conspirators, an extended range of inquiry into explanatory collateral facts may be proper." 5 R. C. L. Conspiracy, §§ 36, 37, and 39; King v. State, 123 Miss. 532, 86 So. 339; 12 C. J. 637; Dykes v. State, 11 Okla. Cr. 602, 150 P. 84; Jenkins v. Com., 167 Ky. 544, 180 S. W. 961, 3 A. L. R. 1522.

The defendants complain, further, that the witness Blanton, who was the keeper of the records of the Altus chapter of the Klan, was permitted to testify that Perkins was a member of the order and, at the time of the offense, was the cyclops, and that the regalia of the cyclops differed from that of the other members of the order, describing the difference. Defendants say that this tended to inflame the minds of the jury. This objection was likewise without merit. This testimony tended to further identify Perkins and

Tays. Tays himself, on cross-examination, admitted his affiliation with the Klan, and Perkins likewise admitted that he was the cyclops at the time of the whipping; that he had charge of the regalia; that he had the only key to the locker in which the regalia was kept; and that his personal regalia was the only one that differed from the regalia worn by the others. Under the circumstances shown in this record, the defendants have no cause for complaint, where they, themselves, took the witness stand and admitted the very things about which complaint is made. Henry v. State, 10 Okla. Cr. 369, 136 P. 982, 52 L. R. A. (N. S.) 113; Blanck v. State, 14 Okla. Cr. 339, 169 P. 1130; Rogers v. State, 9 Okla. Cr. 277, 131 P. 941; Rhea v. Ter., 3 Okla. Cr. 230, 105 P. 314.

The state sought to show by the witness Blanton that this whipping had been officially reported to the local chapter of the Klan. Blanton was a hostile witness from the enemy's camp, and the court permitted a wide range of cross-examination. The defendants complain that the questions asked and the insinuations made during the course of the examination of this witness were prejudicial. From all that appears elsewhere in the record, it appears to us that the questions propounded and the examination made were in good faith. The witness denied that an official report had been made, but did admit that the whipping had been discussed by the members at the meeting following, unofficially. Bond v. State, 9 Okla. Cr. 696, 129 P. 666.

It is within the sound discretion of the court to permit leading questions to be propounded to a manifestly hostile witness. 28 R. C. L. 590, and cases there cited.

Riot at common law, and under provisions of sections 2006 and 2008, Comp. St. 1921, is a compound

offense, including some of the essential elements of a criminal conspiracy, involving the execution of an agreement, express or implied, between three or more persons to commit an assault or a battery or a breach of the peace. The rules of evidence tending to establish concerted action and the identity of the parties participating should be the same as in a criminal conspiracy.

Instruction No. 3-A, given by the court and excepted to by the defendants, reads as follows:

"Therefore, bearing in mind these instructions and applying the same to the evidence before you, should you find from the evidence beyond a reasonable doubt, that in Jackson County, Okla., on or about the 23rd day of April, 1923, the defendants, D. J. Tays and Robert Perkins did then and there, while acting in a body of three or more persons, without authority of law, feloniously combine together, acting in concert, and in pursuance of a common design and intent by means of force and violence, and carried at the time any firearms or other dangerous or deadly weapons, or were disguised by means of masks or otherwise, seized the prosecuting witness, Robert Kimbell, against his will and by the means just stated, and while so acting together in a body composed of three or more, did whip and beat the said Robert Kimbell, with a certain strap or lash, thereby inflicting serious bodily injury upon the said Robert Kimbell, it will be your duty to find the defendants, or such of them as you believe beyond a reasonable doubt, advised, aided, abetted or participated in committing the offense, if the number so committing such offense amounted to three or more, guilty as charged in the information, and unless you find these several averments to be true, beyond a reasonable doubt, your verdict should be not guilty."

The defendants complain that this instruction in effect admonished the jury that if Perkins and Tays

were in the crowd there assembled on the highway, and that if they, as members of this crowd, seized Kimbell and whipped him, their guilt was established. In other words, that it was not necessary to show that these two were acting in concert with the others. Concerted action need not be shown by specific declarations; frequently, the manner of showing concerted action is by circumstantial evidence; and the fact that they were members of an unlawful assembly, clad in masks and regalia that made identification difficult, under circumstances indicating that they were assembled for an unlawful purpose, justified the giving of this instruction. The court did not intend to say, and the jury could not have inferred, that two people were capable, acting alone, of committing the offense charged. The defendants contend that after the members of this hooded mob had intercepted Kimbell and his companions in the highway and ascertained their identity, and after they had offered to extricate his car from the ditch and send him on his way, the act of whipping Kimbell by two of the party was their act alone, and the other members of the party were not acting in concert or implicated with the two who actually did the whipping. Again, applying the rules of evidence applicable to conspiracy, it is not necessary that an unlawful act be perpetrated in accordance with their prearranged plan; but, if executed unlawfully, pursuant to a criminal conspiracy, the offense is deemed to have been committed by each and all of the coconspirators, unless there is proof tending to show that some one or more of them actively withdrew from the conspiracy. Under the circumstances shown, the several members of this mob stood by and acquiesced in this flogging, and it cannot be said that the offense was committed by the two persons who did the actual beating, independent of the others.

Instruction No. 4, complained of by the defendants, reads as follows:

"You are instructed, gentlemen of the jury, that the defense interposed is what is, in law, termed an alibi, which means that the defendants, at the time the alleged crime was committed, were at some other place than the place of the commission of the crime alleged in the information; and you are instructed that if the whole proof raises in your minds a reasonable doubt as to whether these defendants were at the place of the commission of the offense at the time it was committed, or were at a different place, then, in that event, your verdict should be not guilty, as to that defendant or defendants toward whom you have a reasonable doubt as to whether he or they were present at the place and time of the alleged commission of the offense."

Defendants complain that the concluding part of the instruction, "then, in that event, your verdict should be not guilty, as to the defendant or defendants, toward whom you have a reasonable doubt as to whether he or they were present at the place and time of the alleged commission of the offense," shifted the burden of proof to the defendants. The language of the court, "that if the whole proof raises in your mind a reasonable doubt" in connection with the instruction following, admonishing the jury that the defendants are presumed innocent until proved guilty by the state to produce such proof, was sufficient. In an instruction in Davis v. State, 17 Okla. Cr. 604, 191 P. 1044, the court said:

"The correct rule is that if the evidence of an alibi produces upon the minds of the jury a reasonable doubt of the defendant's presence at the time and place where the alleged crime was committed, it would be sufficient to require acquittal."

In one instruction the word "raises" is used; in

the other. the word "produced". This court will not indulge in fine distinction of syntax where the meaning of the instructions, separately and as a whole, sufficiently states the law of the case as applied to the issues raised by the proof. The contention of the defendants that these hooded knights may have been out for exercise or dress parade, or on some mission of charity or mercy, is not borne out by the testimony. This mob intercepted these people who were on a peaceful mission on the public highway, where they had a right to be. When Kimbell and his companions refused to halt, some one of the number fired a gun; there were insulting remarks made, a search of the car, and the whipping that subsequently followed, all indicating a concerted purpose to perpetrate a violent breach of the peace.

There was no instruction upon circumstantial evidence and none was requested by the defendants. Much of the evidence in this case was positive and direct, as distinguished from circumstantial evidence. That being so, it was not error to fail to submit an instruction on circumstantial evidence.

It is next urged that the motion for new trial should have been granted for the reason that one or more of the jurors was biased and prejudiced against members of the Ku Klux Klan, and that the witnesses for the state had made statements to others in conflict with the testimony given at the trial. These claims were supported by affidavits and in like manner controverted by affidavits. Without going into a detailed analysis of the claims made and controverted, we hold that the trial judge did not abuse his discretion in refusing to grant a new trial. That there was no pronounced prejudice among the jurors is indicated by

the fact that they assessed the minimum punishment prescribed by law.

It is claimed that the hostile aggressiveness of Kimbell, his refusal of the proffer of the mob to help him out of the ditch or his failure to embrace other means of escape, was the direct cause of the chastisement they inflicted upon him. The doctrine of contributory negligence does not apply in criminal cases, and it would be preposterous to claim that these 12 or 15 chivalrous knights had to whip him in their own necessary self-defense.

Unlike the defendants, the prosecuting witness is to be commended for seeking redress through the orderly processes of law. Otherwise, there might have been one or more homicide cases here for consideration.

The judgment of the trial court is affirmed.

DOYLE and EDWARDS, JJ., concur.