## MORRIS SYMONDS v. STATE.

No. A-9480. April 21, 1939.

(89 P. 2d 970.)

Luther P. Lane, of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Dixie Gilmer, Co. Atty., of Tulsa, for the State.

BAREFOOT, J. The defendant was charged in the district court of Tulsa county with the crime of directing a riot; was tried, convicted, and sentenced to serve a term of five years in the penitentiary, and has appealed.

Numerous errors are assigned and principally, that the evidence was insufficient to warrant the jury in finding defendant guilty and assessing a sentence of five years in the penitentiary, and that the court erred in refusing to direct a verdict to find the defendant not guilty.

The record discloses that some time prior to July 9, 1937, a number of stores, and especially grocery stores, had formed a practice of opening their doors at an early hour and closing them at a late hour, and keeping open all day Sunday in the city of Tulsa. That many clerks were therefore forced to work long hours and were thereby deprived of an opportunity for recreation and rest, and

the privilege of being with their families. As an outgrowth of this condition there was organized a Retail Clerks International Protective Association, and the same was affiliated with The American Federation of Labor. Defendant became a member of this organization, and was elected as its business manager. It was shown that his duties as such business manager were to contact the managers of the different stores in a peaceful effort to try to persuade them to become members of the organization, and thus permit their clerks to become members, to the end that the conditions above referred to might be corrected.

The testimony on the part of the state revealed that prior to July, 1937, grocery stores were operated in Tulsa by C. R. Jones, L. O. Chapman, and Frank M. Rowell, and other businesses operated by the Long Bell Lumber Company, Roxy Theatre, and Ketchum Hotel. That on the night of July 9, 1937, a mass meeting was held at the courthouse in Tulsa, which about 400 persons attended. The record does not disclose any of the proceedings of this meeting; who called the same; or who participated therein. Those who were there proceeded to the Ketchum Hotel, and many entered therein and considerable property was destroyed. Every inch of duct work from the first floor to the seventh was destroyed. One telephone was torn from the wall. The total damage is not shown. The record discloses that the cause of this visit was because of the installation of certain plumbing in the construction of an air-conditioning system which consisted of machinery and ducts. The crowd then proceeded from the Ketchum Hotel to the Long Bell Lumber Company, where damage was done by breaking out of all the plate glass windows. They then proceeded to the Rowell Grocery store, where "the plate glass in front was all broken out, and the north window broken, the screens damaged, and the front was damaged, and a new awning torn, and then inside about—I guess ten or fifteen hundred dollars worth of merchandise was damaged."

They then proceeded to the grocery store of L. O. Chapman, on the Sand Springs Road, where he testified to the following damage:

"A. I have got 70 foot front on my store that is glass doors, all on tracks, and that was all knocked out, the glass was all out, part of the paint knocked off with rocks, pop bottles and what have you, and the show cases were pretty well all broken but one, some of the scales broken; glass goods of all kinds back on the shelves were broken up and smashed over everything else; just a wreck, that is all there was to it, just a wreck all the way through the store. We didn't have a whole door left in the thing, not one whole door left in the store."

From there they proceeded to the grocery store of C. R. Jones, on the Sapulpa Road. He testified to the following damage:

"A. * * * all the doors were broken and a lot of merchandise destroyed, and a bunch of lights— Q. Talk so I can hear you clear back here, Mr. Jones. A. A bunch of my fixtures were damaged, and there were rocks, bricks, pop and glass all over the store, and I believe the total damage run around $1,500. Q. Did they damage your stock of goods too? A. Yes, sir, stock and fixtures and the building. Q. They pretty well tore up your entire store, is that right? A. Yes, sir."

The statutes under which defendant was tried were, Oklahoma Statutes 1931, section 2534, Okla. Stats. Ann., Title 21, sec. 1311, which provides as follows:

"Any use of force or violence, or any threat to use force or violence if accompanied by immediate power of execution, by three or more persons acting together and without authority of law, is riot."

And Oklahoma Statutes 1931, section 2535, Okla. Stats. Anno., Title 21, sec. 1312, which provides as follows:

"Every person guilty of participating in any riot is punishable as follows:

"(1) If any murder, maiming, robbery, rape or arson was committed in the course of such riot, such person is punishable in the same manner as a principal in such crime.

"(2) If the purpose of the riotous assembly was to resist the execution of any statute of this state or of the United States, or to obstruct any public officer of this state or of the United States, in the performance of any legal duty, or in serving or executing any legal process, such person is punishable by imprisonment in the penitentiary not exceeding ten years and not less than two.

"(3) If such person carried at the time of such riot any species of firearms, or other deadly or dangerous weapon, or was disguised, he is punishable by imprisonment in the penitentiary not exceeding ten years and not less than two.

"(4) If such person directed, advised, encouraged or solicited other persons, who participated in the riot to acts of force or violence, he is punishable by imprisonment in the penitentiary for not exceeding twenty and not less than two years.

"(5) In all other cases such person is punishable as for a misdemeanor."

The following Oklahoma cases have had under consideration the construction of the above statutes: Cochran v. State, 4 Okla. Cr. 379, 111 P. 974; Crawford v. Ferguson, 5 Okla. Cr. 377, 115 P. 278, 45 L. R. A., N. S., 519; Proctor v. State, 5 Okla. Cr. 553, 115 P. 630; Casteel v. State, 13 Okla. Cr. 19, 161 P. 330; Darneal v. State, 14 Okla. Cr. 540, 174 P. 290, 1 A. L. R. 638; Johnson v. State, 16 Okla. Cr. 428, 183 P. 926; Perkins v. State, 35 Okla. Cr. 279, 250 P. 544, 49 A. L. R. 1129.

In the Johnson Case, supra, it is pointed out that under the statute above quoted the crime of riot is a felony. That the different sections of the statute do not create separate or distinct offenses, but when the facts and evidence justify, the jury or court in assessing the punishment may impose a punishment in accordance with the facts. Under the allegations of the information, and the facts in the instant case, the jury must have found that defendant was guilty of a violation of the fourth section of the statute above quoted, because they returned a verdict

and assessed his punishment at five years in the penitentiary. They must have found from the evidence that he did not only participate in the riot, but that he directed, advised, encouraged or solicited others to use force or violence in carrying the purpose of the riot into execution. This case answers the questions of the necessity of the court to instruct the jury on the last subdivision, or subdivision 5, of the statute. The facts in this case did not justify such an instruction. Under the testimony defendant was either guilty of a felony, or not guilty of any offense.

Riot was a common-law offense. The modern definition of riot is in harmony with and follows the common-law definition. It has been defined, 8 R. C. L., page 330, as:

"A tumultuous disturbance of the peace by three persons or more assembling of their own authority with an intent mutually to assist one another against anyone who shall oppose them in the execution of some enterprise of a private nature, and afterward actually executing the same in a violent and turbulent manner to the terror of the people, whether the act intended were of itself lawful or unlawful.

"Another definition frequently used is the same as that just given with the exception that the element of terror to the people is omitted and the nature of the enterprise is not specified.

"A riot has been also defined to be a tumultuous meeting of three or more persons upon some common purpose, to do an unlawful act, which they actually execute with violence; thereby making the character of the act an essential element of the crime.

"The word 'riot' has often been defined, however, without referring either to a purpose to resist opposition or to the inspiring of terror. And these elements are usually omitted from the statutes on the subject. Thus, according to some statutes, whenever three or more persons, having assembled for any purpose, disturb the public peace by using force or violence to any other person, or to property, or threaten or attempt to commit such disturbance, or to

do an unlawful act by the use of force or violence, accompanied with the power of immediate execution of such threat or attempt, they are guilty of riot.

"Another statutory definition is that if three or more persons shall do an act in a violent and tumultuous manner, they shall be deemed guilty of a riot. In some jurisdictions it is not essential that the acts should be done in a tumultuous manner if the intent and power to carry out the common design exists."

It is generally held to be composed of three necessary elements: (1) An unlawful assembly; (2) An intent mutually to assist against lawful authority; and, (3) Acts of violence. In Clifford v. Brandon, 2 Camp. 370, quoted in People v. Most, 128 N. Y. 108, 27 N. E. 970, 972, 26 Am. St. Rep. 458, Chief Justice Mansfield, said:

"[One who] encourages, promotes, or takes part in riots, whether by words, signs, or gestures, or by wearing the badge or ensign of the rioters, he is himself to be considered a rioter."

In 54 C. J. 832, it will be noted that the original assembly may have been by accident, or for a lawful purpose, yet thereafter it may be turned into riotous assembly, and it is not necessary to show a previous agreement or conspiracy by those who participate therein, but under the law where the meeting was lawful, only those who participate after it becomes unlawful are guilty.

Judged by the rules above quoted, and applying the facts to the instant case, it cannot be denied that under the law a riot was carried on in the city of Tulsa on the night of July 9, 1937. Men who had the right to join any organization, which they believed would assist them in bringing about a better living condition for themselves and their families; one that would bring them shorter working hours and better wages; one that under the law gave them the right of collective bargaining; the right to strike; the right to picket; and the right to use every lawful and legitimate means to secure these rights from their

employer; that gave them every right guaranteed by the principles and policies of the American Federation of Labor, should exercise these rights in a lawful manner, and not resort to "riot," and unlawfully destroy the property of others by taking the law into their own hands. Our sympathy is with the man who labors, and who takes a step by the joining of an organization which assists him in the securing of better living conditions, a living wage, and shorter hours of employment, to the end that he may spend more time with his family, but under the law these rights should be secured in a lawful manner, and should not be by resort of taking the law into one's own hands, and the willful destruction of property, as the evidence here discloses.

We have heretofore given the evidence of the state, which showed the happenings on the night of July 9, 1937. We shall now show what the record discloses as to defendant's acts and conduct with reference thereto.

C. H. Todd testified that he was in the grocery business in Tulsa. That he had known defendant 15 years. That defendant came to his place of business the latter part of June, and about two weeks prior to July 9, 1937. That defendant came for the purpose of trying to get him to sign up a union card. That they went out in the backyard, and he asked defendant what they were going to do if he didn't sign up, and defendant told him "that they were going to picket me, and then drive by and throw a bomb in my place, and blow it up." That he then asked him what they were going to do with Chapman, Jones, Rowell and Smith, and defendant said: "We are going to tear their places up and make them sign it." That he asked defendant about the officers, and defendant said: "Yes, he had the city lined up to co-operate with him, and that he hadn't got the county yet, that he couldn't get that damn bullheaded Dixie Gilmer (the county attorney), to do anything."

The witness further testified that defendant returned to his place of business about 11 o'clock on the morning of the 9th of July, 1937, the day the riot was consummated. He came for the purpose of bringing witness a union card. During this time, in a conversation with defendant, he said: "A. He told me that they were going to blow up Chapman, Charlie Jones, and Rowell's Market that night."

And also:

"Q. Did he say anything about the authorities at that time? A. He said that he had got—I asked him if he had got the county lined up, and he said yes, he had got the county lined up; that they had got a man in the county attorney's office and got it lined up to where they had protection there."

On cross-examination, this witness testified that he asked defendant not to blow up Chapman's store until he got a chance to talk with Chapman, and defendant promised to leave them alone. For this reason he did not call them up, as he did not think they would do it. He also testified that his store was picketed by the union some time after July 9, 1937, the date of the riot. He also testified that he told Mr. Gilmer, the county attorney, what he knew about this case in July, 1937.

Harold H. Cooper testified that he was in the grocery and market business, and that he knew the defendant Morris Symonds. His testimony with reference to seeing the defendant on the night of July 9, 1937, while the riot was in progress, was as follows:

"A. I was starting in my automobile, following the crowd of cars that was leaving Chapman's market, and they all stopped and I stopped also, and there was a man standing beside a car past which each one of these other cars seemed to stop, and this man told the occupants of each car in this line something, I don't know which, because I was back of them with my lights on the car, and after which each car drove on, and after they all had driven on I followed also. Q. Who was the man that was doing

that directing? A. That was Mr. Symonds. Q. Morris Symonds, the defendant here? A. Yes, sir. Q. All right. Then what happened? A. I followed them back to Jones' store. Q. All right. Did they go directly after they talked to him, directly to Jones' store? A. Yes, sir. Q. Go ahead. A. And I watched there the occurrence that went on. Q. And what happened there, what did you see there? A. Well, they——."

On cross-examination, he testified he did not see defendant personally after he arrived at the Jones store.

Mrs. Ruth Waxman testified that she owned and ran a grocery store in Tulsa, and that her husband also ran one. That defendant came to her store on Tuesday before Friday, July 9, 1937, for the purpose of trying to get her to sign a union card. She told him she did not need the union sign up because all her orders came in over the telephone, and they were delivered without the customers coming into the store, and that defendant said to her: "Your boy may leave here with the groceries, but he will never get there with them." On cross-examination she testified she kept her store open from about 6:30 in the morning to 7:30 or 8 o'clock at night, and that it stayed open all day Sunday.

J. L. Burkhead testified that he was a special officer at the Ketchum Hotel. He was there on the night of July 9, 1937, when about three hundred fifty people came there, and did damage to the hotel. One of them, not defendant, asked him for his gun which he refused to give up. He testified that he saw Mr. Symonds there, and that he was with the first group that came in.

Edgar S. Worthington testified that he resided at the Ketchum Hotel, and was there on the night of July 9, 1937. That on this occasion, and while the crowd was there, he saw defendant, Morris Symonds, coming down the stairway of the hotel, from the second floor to the first floor.

P. J. Forrester testified that he saw defendant standing on the southwest corner near the Long Bell Lumber Company, on the night of July 9, 1937, when the crowd

was there. He was not in his car, but was standing on the sidewalk.

Frank M. Rowell, whose store was damaged on the night of the 9th of July, 1937, testified as follows:

"A.   Mr. Symonds came in the store, and he told me that he was going to make me close the store at 6 o'clock, 6 p. m., and I told him I just couldn't make the hours so early, our business came in the evening. So Mr. Symonds said, 'Well, if I didn't close he would ruin me. I said, 'How can you ruin me?' He said, 'I will get the customers to quit.' I said, 'All right, if you think you can do that, but' I said, 'that is impossible, you can't get them all to quit.' Q. That was about the substance of it? A. That was about the substance, yes, sir."

Defendant, testifying in his own behalf, said: That he was 42 years of age; that he had resided in Tulsa since 1920, and worked as a clerk in the grocery business; that he was a member of the Retail Clerks Union, and had been elected as its business manager. As to his duties, he said: "A. Well, my duties were to get signed contracts for stores to close up, short hours, and get new memberships, and any men, not employed, to try to find positions or jobs in stores, going out to see the sick if we had any, anything in that line." That in the performance of these duties he contacted many persons. He admitted talking to Mr. Todd and Mrs. Waxman and others, but he denied any conversation as to threats of violence which they related. He said that he only tried to persuade them by peaceful means to join the union, and close their stores on Sunday, and live up to the principles of the union for the better living conditions of the clerks. He testified that a Mr. Sackett, who was second vice president of the Retail Clerks International Protective Association, of Pittsburg, Kansas, came to Tulsa, on the 9th of July, 1937. That his principal business was to see Mr. S. N. Barnes, manager of the Safeway Stores in Tulsa, who had 32 stores there. That they visited several parties, among them Mr. S. N. Barnes. That afterwards, Mr. Sackett went to his home for dinner at 6 p. m. That

shortly after the dinner hour someone called him over the phone and told him there was to be a mass meeting at the court house. That he did not know who called him, and they hung up before he could ask them. That this was the first he knew of the meeting. That both he and Mr. Sackett went to the court house, and when they arrived that about two hundred persons were present. That he did not participate in the meeting in any way. That the crowd left the court house and went to the Ketchum Hotel, and that he went along with the crowd for the purpose of seeing if any of his men were with them but did not see any. That he went inside the hotel lobby, as testified to by the state's witnesses, but soon came out, and said to Mr. Sackett: "Let's get gone from here, they have torn the Ketchum Hotel up." That he had nothing to do with this, and did not counsel or advise anyone in the premises. That he and Mr. Sackett got in his car and drove home by the shortest route which was by the Long Bell Lumber Company. When they arrived home they found there his wife and Mr. and Mrs. Hodges, with whom they had an arrangement to play bridge on that evening. The arrangements having been made long before he knew of the mass meeting at the courthouse. That soon after he arrived home he left and went to the Circle Bar, and secured four bottles of beer and returned within 20 minutes to his home, as they were to have lunch there. That they started to play cards and Mr. Sackett asked to be excused, and he and his wife agreed to take him to the hotel. It was agreed that Mr. and Mrs. Hodges should return to their home and that when defendant and his wife had taken Mr. Sackett to the hotel, that they would go to Mr. Hodges' home and finish the card game. That they did so, and finished playing cards about 2 a. m. That they then returned to their home and left about 4 a. m. for Horton, Kan., to visit some friends. That this trip had been planned for some time, and as they had their belongings packed they decided to leave at once, after coming home from the Hodges. That in Kansas he read in the papers of the riot and called one

of his friends over the phone, and upon being informed that a warrant had been issued for his arrest he immediately started to Tulsa, and drove all night to get there, and presented himself to the officers, and immediately made his bond and was released.

The defendant was corroborated in the above statement by his wife, Mr. and Mrs. Hodges, Mr. Sackett, and other witnesses.

Many substantial citizens were offered as witnesses by defendant, who testified that he bore a good reputation prior to the charges filed against him.

From the evidence above quoted, and we have given rather a full statement thereof, it will be seen that there was a clear cut controversial issue of fact presented to the jury, and which they decided. Under the defendant's testimony he had committed no crime, and was the victim of a set of circumstances for which he should not be found guilty. On the other hand, the state presented a set of circumstances and prior threats and statements and acts of the defendant, which, if believed by the jury, were sufficient for them to find defendant guilty under the law. This evidence has heretofore been quoted. It was the testimony of the witnesses, Todd, Mrs. Waxman, Harold H. Cooper, J. L. Burkhead, Edgar S. Worthington, and P. J. Forrester. The jury saw these witnesses, heard their testimony, with an opportunity to see their demeanor and appearance upon the witness stand. They also had the opportunity to see and hear the defendant and the witnesses offered in defendant's behalf, including those who testified to his good character and reputation. By their verdict it is shown that they believed the statements made by the state's witnesses and returned a verdict of guilty against the defendant. Under these circumstances the law of this state will not permit us to set aside the verdict of the jury. We can not say that the verdict of the jury was written because of prejudice toward the defendant. The record does not warrant us in so finding.

It is urged by defendant as error, that the court permitted the county attorney, the day before the trial commenced, to indorse the name of the witness Todd upon the information. This court in numerous decisions has held that the right to indorse a name on the information, even after the trial has begun, is in the sound judicial discretion of the trial court, and the exercise of this right will not be reversed in the absence of proof of prejudicial abuse of defendant's substantial rights. Shaw v. State, 53 Okla. Cr. 389, 12 P. 2d 550; Harrell v. State, 36 Okla. Cr. 225, 253 P. 516; Star v. State, 9 Okla. Cr. 210, 131 P. 542; Anthony v. State, 55 Okla. Cr. 260, 28 P. 2d 1115. There was some testimony that the name of this witness, and what he would testify to, was known to the county attorney some time in July, before the trial in October. The name should have been placed upon the information as soon as possible, but the court may have been advised of some reason as to why it was not so placed prior to the time permission was given, and this is the very reason which permits the trial court to exercise its judicial discretion. The statement of the county attorney: "We hide a little something all the time," was probably more humorous than circumspect. It should not have been made. We do not believe there was such an abuse of judicial discretion as would warrant a reversal of this case.

It is next urged that the court erred in refusing to sustain defendant's demurrer to the information. This demurrer is based upon the fact that the information enumerates six different places or persons whose places were damaged, and that the information, therefore, charged six distinct and separate offenses. The cases cited by defendant are, to our mind, not in point. Fickle v. State, 38 Okla. Cr. 289, 260 P. 513; Orcutt v. State, 52 Okla. Cr. 217, 3 P. 2d 912. They refer to separate and distinct crimes. Under a charge of riot the evidence showed that it was one continuous act by the same parties acting in unison, and that all of the acts constituted the one charge of riot, and

the proof of the different places destroyed only proved the one crime. The rule in cases involving larceny of property is as stated in 18 A. L. R. 1077:

"Where all the counts of an indictment for larceny are based on the same transaction, it is proper to charge the defendant in different counts with the theft of property belonging to several persons, and the prosecution is not required in such a case to elect on which count it will rely for a conviction, unless it appears to the trial court, in the exercise of a sound discretion, that an election is required to enable the defendant to make his defense without embarrassment or prejudice."

And the rule is the same in reference to receiving stolen property. 18 A. L. R. 1079, and cases cited. Certainly if this is the rule in cases involving larceny or receiving stolen property, it would be true in a case of this character, where one was charged with riot, and each destruction of property was one continuous act, by the same parties, and at the same time, where all the parties were acting together and with a common intent. If defendant had been acquitted of this charge, there is no question but that this acquittal could have been plead as former jeopardy to a subsequent charge, with reference to any of the different places alleged in the information.

It is further contended that the court erred in refusing to quash the information as to Rowell's Grocery and the Roxie Theatre. This contention is made upon the ground that the original complaint in the justice court prior to the preliminary examination did not contain the names above mentioned, but the information, when filed, contained these additional names. This contention is without merit. Under section 2806, Okla. Stats. 1931; Okla. Stats. Anno. Title 22, sec. 264, as construed by the decisions of this court, the county attorney had the right to add these names in the information, if the evidence at the preliminary examination revealed they were involved in the charge. Ponoksy v. State, 8 Okla. Cr. 116, 126 P. 451; Agent v. State, 18 Okla. Cr. 281, 194 P. 233; Haley v. State, 20

Okla. Cr. 145, 200 P. 1009; Filler v. State, 23 Okla. Cr. 282, 214 P. 568; Wilson v. State, 34 Okla. Cr. 220, 246 P. 489.

The contention that the court erred in refusing to give defendant's requested instruction No. 1, which had reference to closing of places of business on Sunday, can not be sustained. The charge against defendant was that of "riot," and while there was evidence as to the keeping open of certain businesses on Sunday, there was nothing in this case which required the giving of this requested instruction. The effort of defendant to secure better working conditions was commendable. This evidence was permitted by the court to go to the jury, and there is no reason to presume that the jury was prejudiced against the defendant.

It is next urged that this case should be reversed by reason of the inflammatory appeal and prejudicial remarks of the county attorney made in his closing argument to the jury. The speech of both the county attorney and his assistant were taken down and transcribed in the record. We have carefully read them. They are strong logical appeals to the jury, and we are sure they had weight with the jury in determining their verdict. No doubt the able speeches delivered by defendant's counsel were such as to cause the jury to render a smaller verdict than they might have otherwise rendered. Strong prosecutors make strong speeches and strong attorneys for defendants make strong speeches, and often secure a verdict of not guilty for their clients, and while the rule is, and should be, that county attorneys, in their closing arguments, should be perfectly fair, and confine their argument to the facts justified by the evidence, and should not deal in abusive language of a defendant, yet they should not be denied the right to present their views and deductions in strong and vigorous language. We have carefully read the speeches delivered in the case by the attorneys representing the state, and while they are strong and vigorous, we do not find that they

transcended the rights of the defendant to the degree that they could be considered prejudicial to this defendant.

We next come to consider the judgment and sentence received in this case. Under the statute the jury could have assessed a minimum punishment of two years, or a maximum punishment of twenty years. They assessed the punishment at five years. In many states the crime of riot is only punished as a misdemeanor. Our statute has provided a much wider latitude, and a much higher punishment. If murder, maiming, robbery, rape or arson is committed in connection with the crime, the punishment is in the manner as prescribed for the principal in such a crime. If the purpose is to resist the execution of any statute of this state or the United States, or obstruction of any officer of the state or the United States, in the performance of any legal duty, the punishment may be assessed at not less than two years, nor more than ten years in the penitentiary. If the defendant, at the time the riot is committed, carries firearms, or any deadly or dangerous weapons, or was disguised, he may be punished not more than ten years, nor less than two years in the penitentiary. Or if he "directed, advised, encouraged or solicited other persons, who participated in the riot to acts of force or violence," he may be punished not less than two years, nor more than 20 years. In all other cases he may be punished as for a misdemeanor which does not carry a penitentiary sentence.

In the instant case, while it is true that property to a large amount was destroyed, and the riot was uncalled for, yet the evidence does not show that any personal violence was committed against anyone. It is not shown that any weapons were carried, nor was anyone disguised. The strongest evidence against defendant consisted of threats and declarations made by himself, and his personal presence at different places where the acts of violence were being committed, his direction of those participating in the riot, which was proved by circumstantial evidence. His

own testimony was such, had the jury seen fit to approve it, that he would have been found not guilty.

After reviewing the whole record, we have come to the conclusion that the judgment and sentence should be modified to two years' imprisonment in the penitentiary, and as so modified, the judgment of the district court of Tulsa county is affirmed.

DOYLE, P. J., and DAVENPORT, J., concur.